# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>　　　　　Plaintiff,<br><br>v.<br><br>AUCTUS FUND MANAGEMENT, LLC, LOUIS POSNER and ALFRED SOLLAMI,<br>　　　　　Defendants,<br><br>and<br><br>AUCTUS FUND LLC,<br>　　　　　Relief Defendant. | Case No. 23-cv-<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## NATURE OF THE ACTION

1.　　From at least 2013 through 2021, defendant Auctus Fund Management, LLC ("Auctus") and Auctus's principals Louis Posner ("Posner"), and Alfred Sollami ("Sollami") (collectively, "Defendants") engaged in the business of acquiring shares of stock, predominantly from penny stock companies,[1] and then selling those shares to investors on the public securities markets.  In this manner, Defendants sold billions of shares to investors and generated tens of millions in profits.  In so doing, the Defendants illegally acted as unregistered securities dealers.

2.　　As a fundamental matter of investor protection under the securities laws, entities like Auctus that act as dealers are required to register with the Commission.  Similarly, individuals like Posner and Sollami who engage in dealer activity are required to be registered or

---

[1] The term "penny stock," as used herein, generally refers to a security issued by a company (also called an "issuer") that trades at less than $5 per share.

to be associated with a dealer registered with the Commission.   Rather than carrying out their dealer activity through or in association with a registered entity as required, Defendants bought and sold stock through an unregistered hedge fund that they controlled, Relief Defendant Auctus Fund LLC (the "Fund").

3.       Over the course of several years, Auctus, Posner, and Sollami routinely obtained discounted shares of stock by entering through the Fund into hundreds of convertible debt financing agreements with companies in need of cash (the "Notes").  The Defendants converted the debt into stock and sold billions of shares into the public market once enough time had passed from the Defendants' funding of the Notes that they could obtain unrestricted or "free trading" shares.

4.       Entering into convertible debt financing agreements with companies was Auctus's primary line of business.  Between 2013 and 2021, the Defendants funded over 150 public companies through the Notes.  The Fund's own financial statements for the years 2013 on identified convertible promissory notes as comprising more than 90 percent of the value of the Fund's investments.  These convertible note deals were lucrative because of the substantial discounts at which the Defendants obtained the shares of stock and the Defendants' resulting ability to profit without a company's stock price rising.

5.       In engaging in this business, without registering with the Commission, the Defendants acquired and sold more than **60 billion** shares of stock, and generated in excess of **$100 million** in gross stock sale profits between 2017 and 2021 alone.

6.       By engaging in a regular business of buying convertible notes, converting the debt into stock at a large discount, and selling the newly-issued shares of stock into the public U.S. securities markets, the Defendants operated as unregistered securities dealers.  Auctus did so

under the direction of Sollami and Posner, who developed this business model for Auctus, who had final authority over Auctus's business decisions, and who failed to register or to associate themselves with a registered dealer.

7.     In violating the dealer registration requirements of the federal securities laws, Defendants avoided regulatory obligations for dealers, including submitting to inspections and oversight by the Commission, following financial responsibility rules, and maintaining required books and records in accordance with applicable regulatory requirements.

8.     Through this conduct, the Defendants violated Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)] by acting as unregistered securities dealers.  Further, as a result of this conduct, the Defendants also violated Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)], which prohibited the Defendants from committing unlawful acts through, or by means of, the Fund they managed.  The Commission requests that this Court enjoin Defendants from committing further violations of the federal securities laws as alleged in this Complaint, and order the Defendants along with Relief Defendant Auctus Fund to disgorge ill-gotten gains along with prejudgment interest thereon, order the Defendants to pay monetary penalties based upon these violations, order penny stock bars as to the Defendants, and order the surrender and cancellation of any securities (including convertible notes, warrants, and shares) obtained by Auctus in connection with its convertible notes business between 2012 and 2021, which are still held by Auctus.

## JURISDICTION AND VENUE

9.     The Commission brings this action pursuant to the authority conferred by Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and seeks to restrain and enjoin Defendants from

engaging in the acts, practices, transactions and courses of business alleged herein, and for such other equitable relief as may be appropriate for the benefit of investors.

10.     This Court has jurisdiction over this action, and venue lies in this District, pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa]. Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein. These transactions, acts, practices, and courses of business occurred in the District of Massachusetts, which is where Auctus is located and does business, and where Posner and Sollami reside.

11.     There is a reasonable likelihood that Defendants will, unless enjoined, continue to engage in the transactions, acts, practices, and courses of business set forth in this Complaint, and transactions, acts, practices, and courses of business of similar purport and object.

## **DEFENDANTS**

12.     Auctus Fund Management, LLC is a Delaware limited liability company created in January 2016. Auctus was created as a successor entity to Auctus Fund Management Inc., which was created in October 2008, with its principal place of business in Boston, Massachusetts. Auctus is owned 51% by Sollami and 49% by Posner. Auctus is an exempt reporting adviser, and has never been registered with the Commission in any capacity.

13.     Posner, age 54, is a resident of Mansfield, Massachusetts. At all times relevant to this Complaint, Posner was co-owner of Auctus and a Managing Director of the Fund. Together with Sollami, he controls Auctus and the Fund.

14.     Sollami, age 55, is a resident of Brookline, Massachusetts.  At all times relevant to this Complaint, Sollami was a Managing Member of Auctus.  Together with Posner, he controls Auctus and the Fund.

## RELIEF DEFENDANT

15.     Posner and Sollami established the Fund as a Delaware limited liability company in October 2008, with its principal place of business in Boston, Massachusetts.  The Fund is owned by several limited partners, including Posner and Sollami.  The Fund has never been registered with the Commission in any capacity.  Auctus was the investment adviser to the Fund as well as its managing member, and was responsible for the Fund's management, including entering into the Auctus Notes.  Posner and/or Sollami entered into the Auctus Notes on behalf of the managing member.

## FACTS

16.     Beginning by at least 2013 and ending no later than 2021, Defendants operated a regular business through which they bought convertible promissory notes (the "Notes") through the Fund by entering into "Securities Purchase Agreements" with companies that traded on the public markets.  The Notes were a type of debt security that could be converted into equity (meaning, shares of stock).  The Defendants would convert the Notes to stock at a price per share that was guaranteed under the terms of the Notes to be substantially discounted from the current market price of the security, and then sell the newly issued shares into the public markets. During the relevant period, the Defendants engaged in more than 100 such transactions, and generated in excess of $100 million in profits in the Fund accounts by trading shares of those companies under the terms of the Notes.

17.     Defendants did not buy and sell the Notes in their own names, but rather in the name of the Fund, which they controlled.  While Defendants admitted some outside investors as

members of the Fund, Defendants retained the exclusive right to manage and control the Fund's business and affairs.  Auctus, which was controlled by Sollami and Posner, had exclusive discretion over investment decisions for the Fund.  Auctus had authority to exercise all voting rights of members of the Fund, and unlimited authority over all of the Fund's investment decisions.

18.     In 2012, the Fund entered into its first Note.  The typical terms of a standard Note entered into through the Fund required the issuer to repay a specified amount with interest within nine months to a year.  While the Notes permitted the borrowers to prepay within six months, the Defendants typically charged a 30 to 50 percent premium of the value of the Notes (including compounded high-rate interest) in order to prepay.  After six months had elapsed, the issuer lost the ability to prepay the Note without the Defendants' consent, and the amount due under the Note could be converted into shares of the company's stock.  The shares would be valued at a significant discount – typically between 30% and 50% lower than the lowest price at which the shares were trading in the days preceding each stock conversion.  Accordingly, if a stock had recently traded at a lower price than the stock price on the date of conversion, Auctus's discount could be even greater than the 30% to 50% rate.

19.     Starting no later than 2018, many of Auctus's Securities Purchase Agreements required issuers to issue warrants to Auctus.  A warrant represents the right to purchase a company's stock at a specific price within a specified time period.  Typically, a warrant is issued directly by a company, and provides the right – but not the obligation – to buy stock.  Under the structure of a typical warrant, Auctus was entitled to purchase shares of the issuer at a fixed price per share.  However, the warrants typically contained "reset" provisions that would lower Auctus's purchase price in several defined circumstances, including if the company issued stock

at a price below the warrant's fixed price.  In addition, the warrants typically contained clauses allowing Auctus to exercise the warrants on a cashless basis where the market value of the stock exceeded the (potentially reset) fixed price.  In certain circumstances the warrants allowed Auctus to obtain issuer shares on a cashless basis at a price substantially below the current market price, such as when an issuer's stock price rose after the fixed price had been "reset" to a low level.

20.    In practical terms, the Notes functioned as discounted stock purchase agreements for companies in need of cash.  When these companies did not prepay the Notes within six months, the Defendants could immediately convert the debt to stock in the company and sell the company's shares – obtained at a deep discount – on the public securities markets.  The Notes prevented companies from prepaying them without Auctus's consent after six months in order to preserve Auctus's right to convert the Notes.

21.    The Notes allowed Auctus to obtain unrestricted shares of the relevant company's stock.  This meant that Auctus could transfer or sell the stock without any limitation.  Unlike restricted shares, unrestricted shares could be immediately sold on the public securities markets without further registration or restrictions on sale.

22.    The Defendants typically entered into Notes on behalf of the Fund with small publicly-traded companies that often had limited options to obtain financing from traditional lenders.  The Defendants agreed to Notes with a variety of types of companies, and described the Fund as "sector agnostic."  Whether they were public companies in more traditional industries, such as technology or mining, or newer types of businesses such as cannabis, the issuers entering into the Notes with the Fund were typically cash-poor and at a developmental stage.

23.     Most companies did not prepay the Notes before the six-month mark had passed because, as the Defendants understood, the companies were often in financial distress and the Notes' penalties often made prepayment infeasible. Notes that were not prepaid were almost never repaid at their ostensible maturity dates because Auctus could typically make more money by converting the debt to shares and selling those shares in the public marketplace.  Indeed, the issuers entering into Notes with the Fund typically had minimal assets, negative cash flow from operations, and unstable operating histories, which was the reason the companies were turning to the Defendants for money instead of more traditional sources, like banks.

24.     The Notes typically had various default provisions which substantially increased the debt due under the note and/or the discount at which Auctus could acquire the stock upon conversion.

25.     The Defendants considered certain factors in determining whether to enter into the Notes.  First, the Defendants would only consider Notes with issuers who were current in their required filings with the SEC, such as Forms 10-K and 10-Q, so that the Defendants could be assured of their ability to convert debt into equity stock of the issuers.  If a public company was delinquent in its filings, the Defendants would be prohibited from obtaining unrestricted shares to sell into the market after the six-month holding period had elapsed, pursuant to Rule 144 of the Securities Act of 1933, making the Notes much less profitable.

26.     In addition, the Defendants targeted public companies with market values below $250 million (*i.e.*, penny stock issuers), which usually lacked access to traditional sources of funding.  Prior to entering into the Notes, the Defendants would also assess whether the issuers were likely to have stock trading volume that could be sustained six months into the future. Liquidity was important to the Defendants because they typically sold shares soon after

obtaining them in conversions.  As Posner explained in a recorded phone call with a broker who was slow to sell shares from convertible notes: "I'm not a long term investor in these things" because "the sooner I can get out of them, the sooner I can do new conversions."

27.     Although it was theoretically possible that companies could pay Defendants back within the first six months of entering into a Note, the Notes charged a substantial premium for "pre-payment" – typically 130% to 150% of the amount currently due under the Note, including penalties and compounded interest.  Moreover, if the companies did not pre-pay the Notes within the first six months, the companies lost the right to pay off the Note without the Defendants' consent.  The typical Note contained onerous penalty terms tied to items like failing to maintain current SEC filings.

28.     While Defendants could – and sometimes did – make money from companies pre-paying these Notes in cash, the general expectation for both parties was that the Defendants would profit by converting the Notes into shares of the issuers at a discount and then selling those shares into the public securities markets.

29.     The Notes rapidly became the core of the Defendants' business model and the primary source of Fund revenue and profits into the Fund.  In 2015, the Defendants received or deposited through the Fund approximately 4 billion shares of stock from convertible note deals with companies.  By 2020, that number was 27.6 billion shares, a growth rate of nearly 600%.

30.     The Defendants' profit model did not rely on appreciation of the issuers' stock prices following investments, but rather on a combination of prepayment premiums, discounts on current trading prices for the stock, and penalty terms from Notes to generate profit.

31.     The following are illustrative examples of transactions in which the Defendants agreed to Notes with companies on behalf of the Fund, exercised its discounted conversion

rights, and sold the resulting newly-issued stock into the public securities markets for a significant profit:

**NaturalShrimp, Inc. (ticker symbol SHMP)**

a. On September 11, 2017, at the Defendants' direction the Fund entered into a Note with a Texas-based aquaculture company called NaturalShrimp, Inc. ("NaturalShrimp") for $146,000.  On that date, NaturalShrimp's stock closed at a reported price of $0.13 per share.  The terms of the Note allowed Defendants to obtain shares of NaturalShrimp at an initial 50% discount from the market trading price.  In addition, terms of the Note increased the actual discount in many conversions to at least 60%.  In addition, the deal also included warrants that allowed Defendants through the Fund to buy NaturalShrimp shares at 15 cents a share – with a special provision that lowered the stock price if NaturalShrimp distributed assets or granted shares at a lower price.

b. In March 2018, the Defendants began converting the debt into NaturalShrimp shares of stock, each time at a substantial discount to the current market price.

c. By December of 2018, the Defendants had obtained and sold more than 42 million shares of NaturalShrimp through the Fund, and generated at least $600,000 in revenue and $500,000 in profit (a return of more than 300%).  At the end of December 2018, NaturalShrimp's stock closed at a reported price of $0.0164 per share.

d. In January and February of 2019, the Defendants purchased and sold over 16 million additional shares of NaturalShrimp acquired through the Fund

pursuant to the warrants, generating almost $4 million in profit, according to internal calculations by Auctus.

### OriginClear, Inc. (ticker symbol OCLN)

a. On April 2, 2018, at the Defendants' direction the Fund entered into a Note with a Florida-based water treatment company called OriginClear, Inc. ("OriginClear") for $150,000.[2]  The terms of the Note allowed the Defendants to obtain shares of OriginClear at an initial 50% discount from the market trading price.  On April 2, 2018, OriginClear closed at a reported price of $0.0367 per share.  The Fund subsequently entered into another Note under near-identical terms with OriginClear for $150,000 on May 31, 2018.

b. On October 5, 2018, the Defendants began converting the debt into shares of OriginClear, as permitted under the terms of the Notes, each time at a substantial discount to the current market price.

e. By December of 2020, the Defendants had obtained and sold more than 402 million shares of OriginClear through the Fund, generating $958,000 in revenue and $658,000 in profit (a 219% return).

### Ozop Surgical Corp. (ticker symbol OSZC)

a. Beginning in November 2018, at the Defendants' direction the Fund entered into a series of Notes with Ozop Surgical Corp. ("Ozop"), a Florida-based medical equipment company.  The terms of the respective Notes allowed the Defendants

---

[2] OriginClear, like many of the penny stock companies with which Auctus entered into convertible promissory Notes, has been sued by Auctus in the District of Massachusetts for alleged violations of state and federal laws related to the company's failure to pay the Notes in full.  While not "related cases" under the D. Mass. Local Rules, the Commission has attached hereto a list of all such matters.  *See* Exhibit A (chart listing all 53 civil actions filed by Auctus in the District of Massachusetts from 2016 to 2021.)

to obtain shares of Ozop at an initial discount rate of at least 35% from the market trading price after six months from the issuance of each Note.

b.  By May 2020, the Defendants and Ozop had executed six such Notes, totaling over $1.2 million

c.  Beginning in May 2019, the Defendants began converting the debt into shares of Ozop, as permitted under the terms of the Notes.

d.  In total, between May 24, 2019 and May 20, 2021, the Defendants converted and sold approximately 1.4 *billion* shares through the Fund, generating $45.4 million in revenue and over $42 million in profit (a 1,402% return).

**Posner and Sollami Managed Auctus and Its Convertible Debt Business**

32.     At all times relevant to this Complaint, Posner and Sollami possessed and exercised the ultimate decision-making power over Auctus, including the power to decide whether to enter into each of the Notes, to negotiate and approve the final deal terms, and to monitor the status of Auctus's investments and its sales of stock, including when and whether to convert under the Notes.  Posner and Sollami also controlled Auctus's and the Fund's bank and brokerage accounts.

33.     Issuers understood that the Defendants engaged in the business of entering into the Notes, and the Defendants held themselves out as convertible stock financiers in their communications with external parties, including investors and brokers.  Posner and Sollami identified and solicited companies through a network of third-party finders, and by responding to inquiries from issuers who learned about Auctus's financing activities.  For example, Posner introduced Auctus to a new broker in 2019 by explaining:  "We're a bridge loan/hedge fund.  We

provide capital to companies predominantly in the penny stock space through a lot of convertible notes."

34.     Posner and Sollami negotiated directly with the issuers who entered into the Notes with Auctus (as well as negotiating any amendments to the original terms).  Posner, Sollami, and/or other employees of Auctus also signed the contracts by which Auctus acquired the Notes.

35.      Sollami touted to Auctus's investors that the Defendants could, through the Notes, get stock at a much cheaper price than average investors and essentially avoid risk in the process.  Sollami described the philosophy of the Fund in a draft speech to investors as "to invest in public companies at either a significant discount to what a stock investor would get or [to] get something of value for free, ideally both[.]"

36.     At all times relevant to this Complaint, Sollami had primary responsibility for interacting and communicating with current and prospective investors in Auctus.

### Defendants Violated the Federal Securities Laws by Acting as Unregistered Dealers

37.     Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) is required to register with the Securities and Exchange Commission.

38.     Between 2013 and 2021, Defendants, as part of a regular business, entered into numerous debt purchase transactions to acquire convertible debt securities of more than 100 different issuers, exercised their conversion rights to obtain more than 60 billion shares of stock, and sold more than 60 billion shares of stock into the market, reaping a gain of more than $100 million in profits.  Defendants deposited the newly issued stock into the Fund's brokerage accounts, which they controlled, and then sold the stock to investors.  In 2021, Defendants ceased entering into new Notes with built-in discount rates of 30% to 50%, but continued their

business practices (such as converting and selling) as to such already-issued Notes.  These business practices constituted the buying and selling of securities.

39.    Defendants used means or instrumentalities of interstate commerce to buy and sell securities.  For example, Defendants used the internet to solicit issuers, transferred cash through wire transfers, and used email and the telephone to negotiate and effectuate sales transactions.  Defendants engaged in much of the conduct described in this Complaint at their Boston, Massachusetts address in this District and/or at their home offices in Massachusetts.

40.    Between 2013 and 2021, Auctus, Posner, and Sollami acted as dealers without either registering with the Securities and Exchange Commission as dealers or associating with a registered dealer.  At no time between 2013 and 2021 were Auctus, Posner, and/or Sollami associated with individuals or entities that were registered with the Securities and Exchange Commission as dealers, nor did the Defendants associate Auctus or the Fund with an SEC-registered dealer.

41.    A person who seeks to register with the Commission as a dealer must file an application on a form called Form BD, located at https://www.sec.gov/files/formbd.pdf.  Form BD asks questions about the applicant and its principals, controlling persons, and employees.  To register as a dealer, the applicant must meet the statutory requirements to engage in a business that involves high professional standards.

42.    Registration with the Commission requires the dealer to provide important information about its business, including but not limited to the names of the direct and indirect owners and executive officers of the business, certain arrangements with other persons or entities, the identities of those who control the business, the states in which the dealer does business, past criminal or regulatory actions against the dealer or any affiliated person that

controls the business, and financial information, including bankruptcy history.  Registration also requires the dealer to join a self-regulatory organization, or a national security exchange, which assist the Commission in regulating the activities of registered dealers.  Finally, registered dealers are subject to inspection by the Commission and the Financial Industry Regulatory Authority ("FINRA") to monitor compliance with the securities laws.

### Defendants Bought and Sold Penny Stocks

43.    A substantial portion of the stock Defendants bought and sold did not meet any of the exceptions from the definition of a "penny stock," as defined by Exchange Act Section 3(a)(51) and Exchange Act Rule 3a51-1.  [*See* 15 U.S.C. Section 78c(a)(51); 17 C.F.R. Section 240.3a51-1].

44.    Defendants therefore participated in the offering of penny stock by acting as securities dealers engaged in the selling of penny stocks.

### COUNT I

### Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)]
**(Against All Defendants)**

45.    The Commission realleges and incorporates by reference the allegations set forth in paragraphs 1 through 44 above.

46.    By engaging in the conduct described above, Defendants made use of the mails or other means or instrumentalities of interstate commerce to effect transactions in, to induce, and to attempt to induce, the purchase and sale of, securities as part of a regular business while not registered with the Commission as dealers, and when Defendants were not associated with an entity registered with the Commission as a dealer.

47.    By reason of the foregoing, Defendants violated, and unless enjoined will likely again violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## COUNT II
## Violations of Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)]
### (Against All Defendants)

48.     The Commission realleges and incorporates by reference the allegations set forth in paragraphs 1 through 44 above.

49.     Section 20(b) of the Exchange Act makes it "unlawful for any person, directly or indirectly, to do any act or thing which would be unlawful for such person to do under the provisions of [the Exchange Act] or any rule or regulation thereunder through or by means of any other person."  15 U.S.C. § 78t(b).

50.     As the adviser to, and managing member of, the Fund, Auctus acted through and by means of the Fund to enter into the Notes and to engage in dealer activity related thereto.

51.     As the principals of Auctus, and managing members of the Fund, Posner and Sollami acted through and by means of the Fund to enter into the Notes and to engage in dealer activity related thereto.

52.     By failing to register the Fund as a dealer, or taking other action to associate the Fund with a dealer prior to entering into the Notes, the Defendants violated, and unless enjoined will likely again violate, Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)].

## COUNT III
## Other Equitable Relief
### (Against Relief Defendant Auctus Fund)

53.     Paragraphs 1 through 44 above are realleged and incorporated by reference as if fully set forth herein.

54.     Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)] states "[i]n any action or proceeding brought or instituted by the Commission under any provision of the

securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

55.     Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)] states "[i]n any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement."

56.     The Relief Defendant has received gains derived from the Defendants' law violations under circumstances dictating that, in equity and good conscience, it should not be allowed to retain.

57.     As a result, the Relief Defendant is liable to disgorge, and should be required to return, its ill-gotten gains.

## **RELIEF REQUESTED**

WHEREFORE, the Commission respectfully requests that this Court:

A.     Enter a permanent injunction restraining each of the Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with Defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices, or courses of business described above, or in conduct of similar purport and object, in violation of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)] and in violation of Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)].

B.     Order Defendants and the Relief Defendant to disgorge all ill-gotten gains and/or unjust enrichment received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

C.      Order appropriate civil penalties upon Defendants pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

D.      Issue an Order permanently restraining and enjoining Defendants from participating in the offering of any penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)].

E.      Order the surrender and cancellation of any securities (including convertible notes, warrants, and shares) obtained by Auctus in connection with its convertible notes business between 2013 and 2021, which are still held by Auctus.

F.      Retain jurisdiction over this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered.

G.      Grant such orders for further relief as the Court deems just and proper.

## JURY DEMAND

The Commission demands a jury trial in this matter for all claims so triable.


Dated:  June 1, 2023                                Respectfully submitted,

                                                   By: _____*Rua M. Kelly*_____
                                                   Rua M. Kelly (BBO #643431)
                                                   Michael P. Franck (BBO #668132)
                                                   Michael C. Moran (BBO #666885)
                                                   David M. Scheffler (BBO #670324)
                                                   Securities and Exchange Commission
                                                   33 Arch Street, 24th Floor
                                                   Boston, MA  02110
                                                   Phone: (617) 573-8941 (Kelly direct)
                                                   Facsimile: (617) 573-4590
                                                   Email:  KellyRu@sec.gov