## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 23-cv-11233-AK |
| AUCTUS FUND MANAGEMENT, LLC, LOUIS POSNER and ALFRED SOLLAMI, | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| AUCTUS FUND LLC, | ) |
| | ) |
| Relief Defendant. | ) |

## OPPOSITION OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION TO DEFENDANTS' MOTION TO DISMISS

Michael C. Moran (Mass. Bar No. 666885)
Rua M. Kelly (Mass. Bar No. 643431)
Michael P. Franck (Mass. Bar No. 668132)
Securities and Exchange Commission
33 Arch Street, 24th Floor
Boston, MA  02110
Phone: (617) 573-8900
Facsimile: (617) 573-4590
moranmi@sec.gov
kellyru@sec.gov
franckm@sec.gov

*Counsel for Securities and Exchange Commission*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………………………………..iii

INTRODUCTION…………………………………………………………………………... 1

FACTUAL BACKGROUND………………………………………………..…...............2

STANDARD OF REVIEW………………………………………………….…..…………3

ARGUMENT………………………………………………………………….…..…….......4

     I.     The Complaint Plausibly Alleges that Defendants were
           "In the Business of Buying and Selling Securities"...……………..……….......4

          A.  The Allegations Distinguish Defendants as "Dealers" from "Traders"………...4

          B.  Defendants Seek to Add a "Customer" Component to the
               Statutory Dealer Definition Where None Exists……………………………..7

          C.  Defendants Incorrectly Conflate the Requirement to Register as a
               Dealer with Rules Regarding Unregistered Securities Transactions………..12

     II.    Defendants Improperly Introduce Unreliable Facts from
           Outside the Complaint………………………………………………………...13

     III.   Defendants' Due Process Claim Lacks Merit…………………...………….15

     IV.   The Commission has Pled a Valid Claim for Disgorgement, as
           Held by District Courts in Near-Identical Cases……………..…………….…17

CONCLUSION…………………………………………………………………..20

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Alvarez v. United States*, 862 F.3d 1297 (11th Cir. 2017)…………………………………………18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)…………………………………………………………………4

*Auctus Fund, LLC v. Drone Guarder, Inc.*,
    C.A. No. 21-11193-WGY, 2023 WL 2401014 (D. Mass. Mar. 8 2023)…...……………..…3 n.3

*Auctus Fund, LLC v. OriginClear, Inc.*,
    C.A. No. 19-10273-FDS, 2023 WL 2140478 (D. Mass. Feb. 21, 2023)…....………....5, 6 n.4

*Bankamerica Corp. v. U.S.*, 462 U.S. 122 (1983)……………………………………………...…15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)……………………………………..……….…3

*Bittner v. United States*, 143 S. Ct. 713 (2023) ……………………………………….........11

*Brison v. Wellpath, LLC*, --- F. Supp. 3d ---,
    C.A. No. 12016-AK, 2023 WL 2495729 (D. Mass. Mar. 14, 2023)………….………....…15

*CFTC v. Southern Trust Metals, Inc.*, 894 F.3d 1313 (11th Cir. 2018)…………………………18

*CMR D.N. Corp. v. City of Phila*, 703 F.3d 612 (3d Cir. 2013)…………………………………16

*Donander Co. v. Comm'r of Internal Rev.*, 29 B.T.A. 312 (1933)………………………………11

*Eastside Church of Christ v. Nat'l Plan, Inc.*, 392 F.2d 357 (5th Cir. 1968)………………*passim*

*EdgePoint Capital Holdings, LLC v. Apothecare Pharmacy, LLC*,
    6 F.4th 50 (1st Cir. 2021)……………………………..…………….....……………..……4-5, 10, 12

*FTC v. Wyndham Worldwide Corp.*, 799 F.3d 253 (3d. Cir. 2015)………………….……...15

*Haley v. City of Boston*, 657 F.3d 39 (1st Cir. 2011)…………………………………….4, 13

*Harriman Nat'l Bank v. Comm'r*, 43 F.2d 950 (2d Cir. 1930)…………………………..12

*In re Sodorff*, 50 S.E.C. 1249, 1992 WL 224082 (SEC Order 1992)…………….…………9-10

*Mass. Fin. Servs., Inc. v. Sec. Investor Prot. Corp.*,
    411 F. Supp. 411 (D. Mass. 1976), *aff'd*, 545 F.2d 754 (1st Cir. 1976)………………..….…6

*Norris Bros. v. Commonwealth*, 27 Pa. 494 (1856)……………………………………..…8

*RFX, Inc. v. Florida Beauty Express, Inc.*,
    C.A. No. 21-cv-11612-AK, 2022 WL 1568445 (D. Mass. May 18, 2022)………..………...17

*Rivard v. Nice Systems, Inc.*,
    C.A. No. 23-10576-AK, 2023 WL 5959305 (D. Mass. Sept. 13, 2023)……...……3-4, 13, 17

*Roth v. SEC*, 22 F.3d 1108 (D.C. Cir. 1994)………………………………………….……...10

*SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020) ...………………………............*passim*

*SEC v. Almagarby*, 2021 WL 4461831, at *3 (S.D. Fl.),
    17-62255-CIV (Aug. 16, 2021)……………..…………………………………...18, 19

*SEC v. Big Apple Consulting USA*, 783 F.3d 786 (11th Cir. 2015)……………..………….5, 16

*SEC v. Carebourn Capital, L.P.*,
    C.A. No. 21-2114, 2022 WL 1639515 (D. Minn. May 24, 2022)…...…..…………..… *passim*

*SEC v. Carebourn Capital, L.P.*,
    C.A. No. 21-2114, 2023 WL 6296032 (D. Minn. Sept. 27, 2023)………..……...…..*passim*

*SEC v. Fierro*, C.A. No. 20-02104, 2020 WL 7481773 (D.N.J. Dec. 18, 2020)………....*passim*

*SEC v. Fierro*, C.A. No. 20-02104, 2023 WL 4249011 (D.N.J. June 29, 2023)………………..1-2

*SEC v. Fife*, C.A. No. 20-5227, 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021)……………..*passim*

*SEC v. GPL Ventures LLC*,
    C.A. No. 21-6814, 2022 WL 158885 (S.D.N.Y. Jan. 18, 2022)…………………..………*passim*

*SEC v. Keener*, C.A. No. 20-21254, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020)…………...1, 7

*SEC v. Keener*, 580 F. Supp. 3d 1272 (S.D. Fla. 2022) .…………………………………... *passim*

*SEC v. Keener*, 644 F. Supp. 3d 1290, 1309 (S.D. Fl. 2022)………………………...…18, 19

*SEC v. Martino*, 255 F. Supp. 268 (S.D.N.Y. 2003)………………………………….......6, 7

*SEC v. Morrone*, 997 F.3d 52 (1st Cir. 2021)…………………………………………….……4

*SEC v. Offill*, 2012 WL 246061 (N.D. Tex. Jan. 26, 2012)………………………………...16

*SEC v. Ridenour*, 913 F.2d 515 (8th Cir. 1990)………………………………………………10

*SEC v. River North Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019)…………………… *passim*

*SEC v. Teo*, 746 F.3d 90 (3d Cir. 2014)……………………………………………………18

*SEC v. Whittemore*, 659 F.3d 1 (D.C. Cir. 2011)……………………………………………..18

*Textron Inc. v. C.I.R.*, 336 F.3d 26 (1st Cir. 2003)………………………..…………10-11

## Rules, Statutes, and Regulations

Federal Rule of Civil Procedure 8(a)(2)……………….…………………………………..3

Federal Rule of Civil Procedure 12(b)(6)……………………………………………....3

Federal Rule of Evidence 201(b)……………………………………………..……14

Section 3(a)(4)(A), Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(4)(A)……………11

Section 3(a)(5)(A), Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(5)(A)………........5, 16

Section 3(a)(5)(A), Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(5)(B)……………..…5

Section 15(a)(1), Securities Exchange Act of 1934, 15 U.S.C. § 78o(a)(1).........................*passim*

17 C.F.R. § 230.144…………………………………………………..………12

17 C.F.R. § 240.15b9-1(a)……………………………………………………..8, 17

17 C.F.R. § 240.15c3-1(a)(2)(vi)…………………………………………..8, 16-17

17 C.F.R. § 240.15c3-1(a)(6)(ii)…………………………...………………..…….8, 16-17

17 C.F.R. § 242.600(b)(52)…………………………………………………......8-9

FINRA Rule 6420(g)…………………………………………...………9

## Treatises

Charles H. Meyer, THE SECURITIES EXCHANGE ACT OF 1934 ANALYZED AND EXPLAINED (1934)…………………………………………………………………..........9

## SEC Publications

1936 SEC *Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker*……………………………………………………..……9

*Acqua Wellington N. Am. Equities Fund*, SEC No-Action Letter, 2001 WL 1230266 (Oct. 11, 2001) ……………………………………………………………………..…..9

*Definition of Terms in and Specific Exemptions for Banks*, 68 Fed. Reg. 8686 (Feb. 24, 2003)....8

*Exemption for Certain Exchange Members*, 88 Fed. Reg. 61850 (Sept. 7, 2023)…………….8 n.6

*Rule 144 Holding Period*, 86 Fed. Reg. 5063, 5066 (Jan. 19, 2021)………………..…12 n.8

## <u>INTRODUCTION</u>

Plaintiff Securities and Exchange Commission (the "Commission") submits this Opposition to Defendants' Motion to Dismiss. *See* Doc Nos. 25-27.[1] Defendants' arguments fail for the reasons described below and their Motion should be denied.

Defendants are wrong on the law and wrong in their assertion that this is a novel case. The Commission has brought unregistered dealer claims, under Section 15(a) of the Exchange Act, against many other individuals and entities with a convertible note business. After considering arguments similar to those raised by Defendants, courts have repeatedly denied motions to dismiss. "Every other district court to have confronted this issue on similar allegations has allowed the action to proceed past the pleadings stage. ... The salient points for each court -- which apply here as well -- included (a) the regularity of Defendants' participation in securities transactions and (b) the level of participation, whether measured by volume of trades or profit realized. Again, the question at the pleadings stage is only plausibility." *SEC v. Fife*, C.A. No. 20-5227, 2021 WL 5998525, at *5-*6 (N.D. Ill. Dec. 20, 2021); *see also SEC v. Carebourn Capital, L.P.*, C.A. No. 21-2114, 2022 WL 1639515, at *1 (D. Minn. May 24, 2022); *SEC v. GPL Ventures LLC*, C.A. No. 21-6814, 2022 WL 158885, at *1 (S.D.N.Y. Jan. 18, 2022); *SEC v. Fierro*, C.A. No. 20-02104, 2020 WL 7481773, at *2-*4 (D.N.J. Dec. 18, 2020); *SEC v. Keener*, C.A. No. 20-21254, 2020 WL 4736205, at *2-*5 (S.D. Fla. Aug. 14, 2020); *SEC v. River North Equity LLC*, 415 F. Supp. 3d 853, 858-59 (N.D. Ill. 2019).

Courts have also granted the Commission summary judgment in similar cases, rejecting identical arguments. *See SEC v. Carebourn Capital, L.P.*, C.A. No. 21-2114, 2023 WL 6296032, at *8-*11 (D. Minn. Sept. 27, 2023); *SEC v. Fierro*, C.A. No. 20-02104, 2023 WL

---

[1] The Commission also responds herein to arguments raised by the Amici brief (Doc No. 37), although the bulk of Amici's arguments are duplicative of the points made by Defendants in their Motion to Dismiss papers.

4249011, at *6-*7 (D.N.J. June 29, 2023); *SEC v. Keener*, 580 F. Supp. 3d 1272, 1275 (S.D. Fla.

2022) (*appeal pending*, No. 22-14237 (11th Cir.)); *SEC v. Almagarby*, 479 F. Supp. 3d 1266,

1271-73 (S.D. Fla. 2020) (*appeal pending*, No. 21-13755 (11th Cir.)).[2]

Consistent with the well-reasoned decisions in numerous similar cases, the Court should

deny the Defendants' motion to dismiss.

## FACTUAL BACKGROUND

For years, Defendants Auctus Fund Management, LLC ("Auctus"), Louis Posner, and

Alfred Sollami have been in the business of acquiring new shares of stock from penny stock

companies and then selling those shares to investors on the public securities markets.  Doc No. 1

at ¶¶ 1, 6.  Rather than registering with the Commission, or associating with a registered entity as

required, the Defendants instead bought and sold stock through an unregistered hedge fund that

they controlled, Relief Defendant Auctus Fund LLC (the "Fund").  *Id*. at ¶2.  Defendants

engaged in this unregistered dealer activity by acquiring newly issued stock through convertible

promissory notes with public companies and then promptly selling the shares onto the market.

*Id*. at ¶¶ 3, 4.

In the simplest terms, convertible promissory notes (the "Auctus Notes") were a

mechanism that allowed struggling companies to gain access to cash in exchange for discounted

shares.  *Id*. at ¶20.  Companies knew that the Defendants offered such Notes, because the

Defendants held themselves out as convertible stock financiers in their communications with

---

[2] Amici misstate that the Complaint "go[es] far beyond what other courts have decided."  Doc No. 37 at 17.
Consistent with other cases, the Complaint alleges not just that Defendants "received discounts from issuers" nor
simply "profited," *id.*, but that those discounts rather than appreciation in stock price (along with penalties that
disincentivized prepayment) were at the core of their profit model.  Doc No. 1 at ¶30; *e.g., River North*, 415 F. Supp.
3d at 859.  Similarly, the Complaint alleges not that Defendants "occasionally used third-parties to find investment
opportunities," Doc. No. 37 at 17, but rather that they used "a network of third-party finders."  Doc No. 1 at ¶33;
*see, e.g., Carebourn Capital*, 2023 WL 6296032, at *5; *Fife*, 2021 WL 5998525, at *1, *Almagarby*, 479 F. Supp. 3d
at 1272.

external parties, such as investors and brokers, and Auctus solicited customers through third

party finders.  *Id*. at ¶33.  Under the terms of a typical Auctus Note, public companies received

cash from Auctus, but if they failed to prepay (plus interest) within six months, Auctus could

immediately convert the company's debt into stock, and sell those newly-issued shares into the

public market.[3]  *Id*. at ¶¶ 6, 16, 20.  This was often lucrative for Defendants, because they

obtained the stock at a deep discount to the market price.  *See, e.g.*, *id*. at ¶31(a).

Perhaps unsurprisingly, Auctus accelerated the use of the Notes in recent years.  In 2015,

the Defendants received or deposited through the Fund approximately 4 billion shares of stock

from the Auctus Notes.  *Id*. at ¶29.  By 2020, that number was 27.6 billion shares -- a growth rate

of nearly 600%.  *Id*.  In total, between 2013 and 2021, Defendants, as part of a regular business,

entered into Notes with more than 100 different issuers, exercised their conversion rights to

obtain more than 60 billion shares of stock, and sold more than 60 billion shares of stock into the

market, for a total gain of more than $100 million in profits.  *Id*. at ¶38.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a)(2) "requires only 'a short and plain statement of the

claim showing that the pleader is entitled to relief in order to 'give the defendant fair notice of

what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 555 (2007).  A complaint will survive a Rule 12(b)(6) motion to dismiss when it

alleges "sufficient facts to state a claim for relief that is 'plausible on its face' and actionable as a

matter of law."  *Rivard v. Nice Systems, Inc.*, C.A. No. 23-10576-AK, 2023 WL 5959305, at *2

---

[3] In a recent decision, Judge Young found that convertible promissory notes entered into by Auctus included excessive rates of interest that violated the Massachusetts Usury Act (M.G.L. ch. 271 § 49(a)) and by extension violated the Massachusetts Unfair Trade Practices statute (ch. 93A).  *Auctus Fund, LLC v. Drone Guarder, Inc*., C.A. No. 21-11193-WGY, 2023 WL 2401014, at *8 (D. Mass. Mar. 8, 2023) (noting that "[c]ourts in this District have frowned on Auctus' business model as violating the Massachusetts' policy against usury") (citing cases).

(D. Mass. Sept. 13, 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Factual

allegations are accepted as true at this stage, distinct from conclusory legal statements.  *Id*.

Claims are plausible if the factual allegations "present a 'reasonable inference that the defendant

is liable for the misconduct alleged.'"  *Id*. (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st

Cir. 2011)).  In deciding a motion to dismiss, courts "must accept the truth of all of Plaintiff's

well-pleaded facts and draw all reasonable inferences from those facts in [plaintiff's] favor."  *Id*.

at *4.  Accordingly, the allegations in the Complaint must be taken as true and the Commission

is entitled to all reasonable inferences from the allegations.

## ARGUMENT

I.   **The Complaint Plausibly Alleges that Defendants were "In the Business of Buying and Selling Securities"**

### A.  The Allegations Distinguish Defendants as "Dealers" from "Traders"

The Complaint more than plausibly alleges that Defendants violated Section 15(a)(1) of

the Exchange Act, which "makes it unlawful for a dealer to effect any transaction in, or to induce

or attempt to induce the purchase of any security, unless such dealer is registered with the SEC

or, in the case of a natural person, is associated with a registered broker-dealer."  *Fierro*, 2020

WL 7481773, at *2 (internal citation and quotation omitted).  "A person may 'effect

transactions' by assisting an issuer to structure prospective securities transactions, by helping an

issuer to identify potential purchasers of securities, or by soliciting securities transactions."

*EdgePoint Capital Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 57 n.5 (1st Cir.

2021) (quoting *SEC v. Morrone*, 997 F.3d 52, 61 (1st Cir. 2021)).  As the First Circuit observed

in *EdgePoint Capital*, "the requirement that brokers and dealers register is of the utmost

importance in effecting the purposes of the Exchange Act."  *Id*. at 58 (quoting *Eastside Church*

*of Christ v. Nat'l Plan, Inc.*, 392 F.2d 357, 362 (5th Cir. 1968)).  "It is through the registration

requirement that some discipline may be exercised over those who may engage in the securities business and by which necessary standards may be established with respect to training, experience, and records." *Id.*; *see also* Doc No. 1 at ¶7.

Section 3(a)(5)(A) of the Exchange Act defines "dealer" as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A). The Exchange Act's dealer definition contains a carve-out, commonly referred to as the "trader exception" for persons who buy and sell securities "for such person's own account . . . but not as a part of a regular business." *See* Section 3(a)(5)(B) [15 U.S.C. § 78c(a)(5)(B)]. In other words, both the dealer definition and its trader exception apply to persons trading for their "own account", and the distinction is in whether it is part of a regular business. If, as Defendants wrongly contend, there is an unwritten statutory assumption that a "dealer" only services customers, then the statutory trader exception would not need to exist. Traders do not have customers and would therefore be excluded from the "dealer" definition under Defendants' reasoning, without need for the express statutory exception.

The "centerpiece" of the "dealer" definition, therefore "is the word 'business,' which is defined as 'a commercial enterprise carried on *for profit*, a particular occupation or employment habitually engaged in for *livelihood or gain*.'" *Carebourn Capital*, 2023 WL 6296032, at *9 (quoting *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015)); *see also Eastside Church*, 392 F.2d at 360-62 (dealer "purchased many church bonds . . . for its own account *as part of its regular business* and sold some of them" after acquiring the bonds "at a discount") (emphasis added); *Auctus Fund, LLC v. OriginClear, Inc.*, C.A. No. 19-10273-FDS, 2023 WL 2140478, at *7 (D. Mass. Feb. 21, 2023) ("centerpiece to this definition is the word

'business'").[4]  The allegations of the Complaint are entirely consistent with Defendants being in the business of buying and selling securities, and their motion to dismiss should be denied.

Rather than reading the statute "hyperliterally" or "out of context," as Defendants contend (Doc No. 26 at 7, 18), the Commission has made specific allegations of a particular sort of buying and selling that distinguishes a dealer from a trader.  *See GPL Ventures*, 2022 WL 158885, at *5 ("Complaint plausibly alleges that the [] Defendants' business model involved a regularity of business activity largely approximating that of a broker-dealer, requiring them to register with the SEC.").  The Complaint alleges that Defendants were in the business of providing capital to companies and bringing to the market new shares of stock.  Doc No. 1 at ¶¶ 6, 16.  In this manner, Defendants brought to the market billions of new shares of stock over a course of many years, involving over 100 public companies.  *Id.* at ¶¶ 4, 38.  This was dealer activity because it involved a "certain regularity of participation in securities transactions." *River North*, 415 F. Supp. 3d at 858 (quoting *Mass. Fin. Servs., Inc. v. Sec. Investor Prot. Corp.*, 411 F. Supp. 411, 415 (D. Mass. 1976), *aff'd*, 545 F.2d 754 (1st Cir. 1976)); *see also GPL Ventures*, 2022 WL 158885, at *6 ("courts consider whether the individual or entity may be 'characterized by a certain regularity of participation in securities transactions at key points in the chain of distribution") (quoting *SEC v. Martino*, 255 F. Supp. 268, 283 (S.D.N.Y. 2003)).

The sheer volume of buying and selling activity is a strong indicator that Defendants engaged in the business of buying and selling securities.  *See Fierro*, 2020 WL 4781773, at *4 (complaint plausibly alleged dealer activity where defendants transacted in over fifty notes of more than twenty issuers "and then sold the newly issued shares of stock into the public

---

[4] OriginClear was an issuer of convertible notes, and moved to void a settlement agreement with Auctus as a contract made in violation of the Exchange Act, arguing that Auctus was an unregistered dealer.  Chief Judge Saylor upheld the settlement agreement, and found that whether Auctus acted as a dealer "would require extensive discovery, motion practice, and other litigation, including, potentially, a trial." *Id*. at *8.

market"); *see also Carebourn Capital*, 2022 WL 1639515, at *4 ("high volume of buying and selling securities can be indicative of engaging in a regular business such that registration is required"); *Keener*, 2020 WL 4736205, at *4; *River North*, 415 F. Supp. 3d at 858.

As in similar cases, the Commission has also alleged that Defendants held themselves out as being in this business.  Doc No. 1 at ¶ 33 (Defendants "identified and solicited customers through a network of third-party finders, and by responding to inquiries from issuers who learned about Auctus's financing activities."); *Carebourn Capital*, 2023 WL 6296032, at *5, *10; *Fife*, 2021 WL 5998525, at *1; *Almagarby*, 479 F. Supp. 3d at 1272.

### B. Defendants Seek to Add a "Customer" Component to the Statutory Dealer Definition Where None Exists

Defendants are incorrect that "dealer" is limited to one who effects transactions on behalf of customers.  Instead, "the relevant focus is on the activities that the person or business performs, not whether a person or business has customers or provides services."  *GPL Ventures*, 2022 WL 158885, at *5 (quoting *Martino*).  Defendants argue that the "own account" reference in the dealer definition must be referring to a manner of carrying out customer orders (Doc No. 26 at 8-11).  That argument is contrary to the plain text of the Exchange Act.  In crafting the trader exception, Congress specified that both dealers and non-dealers buy and sell securities for their "own accounts," the difference being that a dealer is in the "business" of doing so.  And the business of dealers in the securities markets is not confined to carrying out customer transactions.  Dealers, like Defendants, engage in selling group or underwriting activity to bring new shares to market for companies that are not in the business of carrying out large stock distributions (*e.g.*, aquaculture or water treatment companies (Doc No. 1 ¶ 31)).  In bringing new shares to market, dealers profit by purchasing stocks at a discount from issuers and profit from selling the stocks at full price. *See River North*, 415 F. Supp. at 859.  This is distinct from a

trader, who buys in the marketplace and profits from market-driven price increases.  *Id*.

Defendants' underwriting-type activity "has been recognized by the SEC as characteristic of a

'dealer.'"  *Id*.; *see also Definition of Terms in and Specific Exemptions for Banks*, 68 Fed. Reg.

8686, 8688 (Feb. 24, 2003) ("dealers normally . . . have a regular turnover of inventory (or

participate in the sale or distribution of new issues, such as by acting as an underwriter)").

The Exchange Act's definition of a "dealer" -- and its distinction from a trader -- is

consistent with historical, and ordinary, usage.  "A dealer, in the popular, and therefore in the

statutory sense of the word, is not one who buys to keep, or makes to sell, but one who buys to

sell again."  *Norris Bros. v. Commonwealth*, 27 Pa. 494, 495 (1856).  A dealer is one who buys a

product to turn around and sell it for profit, rather than holding on for appreciation in value.

Consistent with there being dealers without customers, there are rules specific to those

without customers.  For example, Rule 15b9-1 under the Exchange Act provides an exemption

from the requirement to become a member of a registered national securities association (*i.e.*, the

Financial Industry Regulatory Authority ("FINRA"))[5] if, among other things, the broker or

dealer "carries no customer accounts."  17 C.F.R. § 240.15b9-1.[6]  *See also* 17 C.F.R. §§

240.15c3-1(a)(2)(vi), 6(ii) (net capital requirements for dealers who neither carry customer

accounts nor hold funds or securities for customers).  And as Defendants' amici point out (Doc.

37 at 9), a dealer can include a market maker.  In the context of over-the-counter penny stocks,

such as those involved here, a "market maker" is a dealer that provides liquidity to the market by

"hold[ing] itself out as being willing to buy from and sell to its customers, *or others* . . . for its

---

[5] FINRA is a non-profit self-regulatory organization that regulates the activities of broker-dealers; while the Commission oversees FINRA, FINRA is an independent agency.  *See* finra.org/about (last visited 9/28/23).

[6] Rule 15b9-1 is referred to as the "proprietary trading exemption."  *See Exemption for Certain Exchange Members*, 88 Fed. Reg. 61850 (Sept. 7, 2023).  The Commission recently adopted an amendment to Rule 15b9-1, with an effective date of November 6, 2023.  *Id*.

own account on a regular or continuous basis." 17 C.F.R. § 242.600(b)(64) (emphasis added); *see also* FINRA Rule 6420(g) ("'OTC Market Maker' means a member of FINRA that holds itself out as a market maker by entering *proprietary quotations or indications of interest* for a particular OTC Equity Security in any inter-dealer quotation system") (emphasis added).  The no-action letter cited by Defendants also contemplates the wide range of dealer activity.  *See Acqua Wellington N. Am. Equities Fund*, SEC No-Action Letter, 2001 WL 1230266, at *4 (Oct. 11, 2001) (dealers carry "inventory in securities", quote a "market in securities", and participate "in a selling group or . . . as an underwriter").

Materials cited by Defendants and their amici contemplate the range of conduct of a dealer.  The 1936 SEC *Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker* stated that a dealer "is at complete liberty to deal for his own account *with persons other than his customers*."[7]  Defendants also cite a 1933 treatise by Meyer distinguishing a broker from a dealer in effectuating customer orders.  Doc No. 26 at 9-10.  Meyer, however, later published a treatise on the newly enacted Exchange Act, and considered "whether a trader who has no customers but merely trades for his own account through a broker is a 'dealer' under the Act."  Charles H. Meyer, THE SECURITIES EXCHANGE ACT OF 1934 ANALYZED AND EXPLAINED 34 (1934) (attached as <u>Ex. 1</u>).  Meyer concluded: "A fair interpretation of the Act would seem to indicate that if the operations of a trader are sufficiently extensive to be regarded as regular business[,] he would be considered a 'dealer.'"  *Id.*

Defendants also mischaracterize the Commission's holding in *Sodorff* to suggest that the Commission "unanimously held a dealer effectuates customer orders."  Doc No. 26 at 16. Instead, the Commission found that Sodorff acted as an unregistered dealer because he

---

[7] https://www.sechistorical.org/collection/papers/1930/1936_0620_SECSegregationReport.pdf at XV (emphasis added).

distributed an issuer's securities to investors through activities "conducted for his own account, and therefore involved dealer activity." *In re Sodorff*, 50 S.E.C. 1249, 1992 WL 224082, at *5 (SEC Order 1992).  The Commission distinguished Sodorff's conduct from an investor or trader because his "profits did not result from appreciation in the value of the securities, but rather from his markup over the price he paid." *Id*.  The "dispositive" fact deeming Sodorff a dealer was that he "'engaged in the business of buying and selling securities.'" *Id*. at *5 n.25.  Nowhere in *Sodorff* did the Commission hold, as Defendants suggest, that a dealer *only* effectuates customer orders.  Defendants cite other cases with the respective dealer analyses on the business inquiry, not the presence of customers. *See SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990) ("Ridenour's level of activity during this period made him more than an active investor"); *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) ("record clearly reflects that Roth conducted a private securities business").

Defendants also cite *Oceana Capital* for the proposition that "dealer means buying and selling regularly in the service of others, rather than self-interestedly."  Doc No. 26 at 17.  But that is consistent with a dealer raising capital for a company through the issuance of new stock. In that way, while there is not a customer element in the dealer definition, Defendants *did* have customers -- the companies who sold their securities to Defendants to raise capital.  *See EdgePoint Capital*, 6 F.4th at 59 (issuer of securities among class of persons meant to be protected by Section 15(a) registration requirement).

The Court need not turn to defendants' canons of statutory interpretation (Doc No. 26 at 15) to suggest that the terms "broker" and "dealer" should be read together because they often appear near each other.  *See Textron Inc. v. C.I.R.*, 336 F.3d 26, 31 (1st Cir. 2003) ("The Supreme Court has repeatedly emphasized … that if the language of a statute or regulation has a

plain and ordinary meaning, courts need look no further and should apply the regulation as it is written."). Congress defined broker in the Exchange Act, and it separately defined dealer. A *broker* is defined in Section 3(a)(4)(A) as "any person engaged in the business of *effecting* transactions in securities for the account of *others*." 15 U.S.C. § 78c(a)(4)(A) (emphasis added). The terms "effecting" and "others" are notably absent from the dealer definition, even though a dealer can effect transactions for others through the dealer's own account -- because that's not all that a dealer can do. Congress could have added language to define a dealer as one who uses the dealer's own account to effect transactions for others, but Congress did not do so. *See Bittner v. United States*, 143 S. Ct. 713, 720 (2023) ("[w]hen Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning").

Nor should the Court accept Defendants' invitation to add to the Exchange Act's dealer definition a new requirement that securities be bought and sold "in the same form." Doc No. 26 at 22-23. There is no such provision in the Exchange Act definition, and the state court cases cited by defendants have no bearing here. *See Carebourn Capital*, 2022 WL 1639515, at *6 (rejecting similar argument and noting "[n]one of the cases involved an interpretation or application of the 'dealer' definition from the Exchange Act and they provide no insight into congressional intent in defining what it means for a person to be in the business of buying and selling securities under the relevant statutory language").

Defendants' caselaw from the 1930s is also distinguishable. Defendants cite *Donander Co.* and *Harriman National Bank* (Doc No. 26 at 13), two decisions which dealt with the definition of "dealer" in the Revenue Act of 1928, a definition which specified a customer component. *See Donander Co. v. Comm'r of Internal Rev.*, 29 B.T.A. 312, 314-15 (1933);

11

*Harriman Nat'l Bank v. Comm'r*, 43 F.2d 950, 952 (2d Cir. 1930) (same).  Congress used a different definition in the Exchange Act six years after the Revenue Act, and the Court is "precluded" from adding new language to the statute.  *EdgePoint Capital*, 6 F.4th at 62.

There is also no merit to Defendants' argument (Doc No. 26 at 11-12) that investment companies and investment advisers are not regulated as dealers.  As Amici point out, investment advisers and investment companies are different, and subject to different regulatory regimes. Doc No. 37 at 6.  For instance, investment advisers, unlike dealers, are compensated by an advisory fee.  *Id.*  Investment companies (*i.e.*, mutual funds) are subject to the Investment Company Act of 1940's requirement to continually offer and redeem their shares.  15 U.S.C. § 80-22.  There are policy reasons, therefore, to distinguish investment companies from dealers. None of that has any bearing on the well-pled allegations that Defendants' particular business put them in the dealer camp rather than the trader camp.

### C.  Defendants Incorrectly Conflate the Requirement to Register as a Dealer with Rules Regarding Unregistered Securities Transactions

Defendants and Amici make much of the Commission's allegation that the *transactions* at issue were carried out consistent with a Rule 144 exemption.  Defendants and Amici, however, conflate the registration of securities *transactions* with the registration of securities *actors*.  Rule 144 allows for the sale of stock in transactions not registered with the Commission, without violating Section 5 of the Securities Act.  17 C.F.R. § 230.144; 15 U.S.C. § 77e(a).  Rule 144 creates a statutory safe harbor protecting sellers in unregistered securities transactions from being deemed a statutory underwriter.  17 C.F.R. § 230.144 (Preliminary Note).[8]  That does not mean

---

[8] The Commission's proposed rule, *Rule 144 Holding Period*, 86 Fed. Reg. 5063, 5064-66 (Jan. 19, 2021), cited by defendants (Doc No. 26 at 3) would amend Rule 144 to "mitigate the risk of unregistered distributions in connection with sales of market-adjustable securities"--*i.e.*, the sorts of securities distributed by defendants -- because of the "incentive to purchase the market-adjustable securities with a view to distribution of the underlying securities

that someone, like Defendants, who *is* a dealer in securities is exempt from registering in that

capacity.  *See Carebourn Capital*, 2023 WL 6296032 at *13 ("Defendants' compliance with

Rule 144's six-month holding period is simply not material to the question of whether they were

required to register as dealers under Section 15(a)(1) of the Exchange Act.") (citing *Keener*, 580

F. Supp. at 1288); *see also Eastside Church*, 391 F.2d at 361 (church bonds exemption from

Securities Act registration provisions immaterial to "broker-dealer registration provisions").  The

dealer registration requirement is not limited to those who engage in illegal securities

transactions.

## II.    Defendants Improperly Introduce Unreliable Facts from Outside the Complaint

The Court should rebuff Defendants' entreaty to consider materials extraneous to the

Complaint.  Courts deciding a Rule 12(b)(6) motion ordinarily "may not consider any documents

that are outside of the complaint, or not expressly incorporated therein, unless the motion is

converted into one for summary judgment."  *Rivard*, 2023 WL 5959305, at *2.  Courts may

consider "documents the authenticity of which are not disputed by the parties; for official public

records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the

complaint."  *Id*.  *See also Haley*, 657 F.3d at 46 (court may consider "documents incorporated by

reference into the complaint, matters of public record, and facts susceptible to judicial notice").

Defendants attach exhibits to support their erroneous arguments that the Commission has

previously taken a different view of the term "dealer" or that this litigation is unfair.

Defendants' arguments are wrong, but they are especially inappropriate at the motion to dismiss

stage, which considers only the sufficiency of the complaint.[9]

---

following conversion to capture the difference between the built-in discount and the market value of the underlying
securities."

[9] Defendants' extraneous exhibits which the Court should disregard include: *Revolutions Med*. Complaint (Doc No.
27-4); *Revolutions Med*. deposition transcript (Doc No. 27-5); SEC brief in *SEC v. Lyon* (Doc No. 27-7);

The Court may only take judicial notice of facts, including at the motion to dismiss stage, if those facts are "not subject to reasonable dispute" including because those facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Defendants, however, make arguments about what their exhibits say that are factually inaccurate. For instance, Defendants cite the SEC's 2012 *Revolutions Medical Corp.* complaint that described a 2010 agreement between Revolutions Medical Corp. and Auctus. The complaint indicates that the *agreement* "permitted" Auctus to resell certain shares. Doc No. 27-4 at ¶17. The Commission alleged that Revolutions Medical had engaged in fraud and that Auctus was a victim. *Id.* at ¶33. Defendants now stretch the reference to what the *agreement* "permitted" to suggest that the Commission had "permitted" Auctus's arrangement. Doc No. 26 at 1, 4, 25. Defendants similarly attribute questions from a Revolutions Medical deposition to Commission counsel (Doc No. 26 at 4-5). But it appears from the transcript (Doc No. 27-5) that it was the attorney for Revolutions Medical who asked the cited questions. Nor is it persuasive that Auctus's name came up in a handful of SEC filings in 2018 or 2019 (Doc No. 26 at 5, 22). Or that Auctus may have provided FINRA with a sample contract during a 2014 examination of an entity registered with FINRA (Doc No. 26 at 6).

Also unavailing is Defendants' argument that the Commission has for years "overlooked or ignored" their "exact activity" (Doc No. 26 at 18-20). Defendants premise this argument on reading the Complaint in "the narrowest terms possible" to generally involve "acquiring shares of stock and then selling those shares in the market." *Id.* at 18-19. Courts deciding a motion to dismiss, however, do not read complaints in their "narrowest terms" but rather "as a whole."

---

hyperlinked securities filings (Doc No. 26 at 5 and 22); Forbes article with hearsay regarding FINRA examination (Doc No. 26 at 6); FINRA Letter of Acceptance (Doc No. 26 at 6); SEC News Release No. 13-249 (Doc No. 26 at 20); and (9) J.W. White article (Doc No. 26 at 21).

*Brison v. Wellpath, LLC*, --- F. Supp. 3d ---, C.A. No. 12016-AK, 2023 WL 2495729, at *2 (D.

Mass. Mar. 14, 2023).  The Complaint specifically alleges a course of conduct -- repeated, high

volume distribution of new shares into the market, with profit from issuer discounts, and the use

of third-party finders -- consistent with dealer activity, as multiple other courts have found.

*Supra*, pp. 1-2.  Defendants point to no examples of their business model being at all "pervasive

and open" without enforcement like the interlocking directors of large corporations at issue in

Defendants' cited precedent.  *See Bankamerica Corp. v. U.S.*, 462 U.S. 122, 130 (1983).

Defendants instead attempt to draw parallels with a hodgepodge of other unrelated matters (Doc

No. 19-21), none of which is the "exact activity" as Defendants.  The exact activity of

Defendants is, in fact, the subject of multiple Commission actions -- all of which have proceeded

past the pleading stage, and many of which have now resulted in summary judgment for the

Commission.  *Supra*, pp. 1-2.  Defendants' strained comparisons shed no light on the meaning of

"dealer" and are irrrelevant.

The Court should disregard Defendants' unfounded arguments about prior Commission

actions, particularly where Defendants improperly rely on materials extraneous to the Complaint.

## III.    Defendants' Due Process Claim Lacks Merit

Defendants' argument that they lacked "fair notice", and therefore that due process

requires dismissal of the Commission's complaint, is unfounded.  This matter involves the

application of a statute -- 1934's Exchange Act, Section 15(a) -- and not an agency's

interpretation of a rule.  When applying a statute, "[t]he relevant question is not whether

[defendant] had fair notice of the *[agency's] interpretation* of the statute, but whether

[defendant] had fair notice of what the *statute itself* requires."  *FTC v. Wyndham Worldwide

Corp.*, 799 F.3d 236, 253-54 (3d. Cir. 2015).  Civil statutes that govern economic activities only

violate the due process clause when the statute provides "no rule or standard at all." *Id.* at 250

(quoting *CMR D.N. Corp. v. City of Phila*, 703 F.3d 612, 631-32 (3d Cir. 2013)); *see also SEC v. Fierro*, 2020 WL 7481773, at \*5 (D.N.J. Dec. 18, 2020).

In this case, the relevant registration requirement of Exchange Act Section 15(a)(1) and

the dealer definition of Section 3(a)(5)(A) are clear and unambiguous.  The key terms utilized in

those sections -- "buying and selling securities," "business," and "own account" -- are standard

terms that provide a person of ordinary intelligence fair notice that they may be a dealer and

therefore required to register with the SEC.  Accordingly, every court to date faced with a due

process challenge related to Exchange Act 15(a)(1) has rejected it.  *Carebourn Capital*, 2022 WL

1639515 at \*6-\*7 (finding that the Exchange Act dealer language "sets a reasonably clear

standard by which a person can determine whether or not his conduct is unlawful."); *GPL Ventures*, 2022 WL 158885, at \*5 n.3 (defendant who previously worked at a broker-dealer

"knew or should have known that failing to register" might violate Section 15(a)); *Fife*, 2021 WL

5998525 at \*7 ("Defendants and all others even arguably involved in securities transactions"

have had notice of the statutory language); *Fierro*, 2020 WL 7481773, at \*5; *River North*, 415 F.

Supp. 3d at 859 ("definition at issue is broad").  Indeed, several judicial interpretations of

Section 15(a)'s dealer provisions predate most or all of the relevant conduct in this matter.  *See

Big Apple Consulting*, 783 F.3d at 809-10; *Eastside Church*, 391 F.2d at 361-62; *SEC v. Offill*,

2012 WL 246061, \*9 (N.D. Tex. Jan. 26, 2012) (defendant acting as a dealer where he bought

millions of shares through companies that he controlled and sold some to the public).

In addition, there was also ample notice that unregistered dealer liability is not limited to

entities which effectuate customer orders.  Commission regulations that predate Defendants'

conduct apply to dealers without customers.  *Supra*, p. 8 (citing 17 C.F.R. §§ 240.15c3-

1(a)(2)(vi), 6(ii) (effective June 4, 2008) and 17 C.F.R. § 240.15b9-1(a) (effective Aug. 28, 2005)).  Furthermore, Commission actions and judicial decisions predating Defendants' conduct in this matter found Section 15(a)(1) liability in situations where the relevant parties were not effectuating customer orders.  For example, in 1968 the Fifth Circuit found a defendant to be acting as a dealer because it "purchased many church bonds … for its own account as part of its regular business and sold some of them" after acquiring the bonds "at a discount." *Eastside Church,* 391 F.2d at 360-62.  While Defendants characterize *Eastside Church* as involving sales to customers, (Doc No. 26 at 17), the Fifth Circuit rejected as "not applicable under the facts" a claim that the defendants had violated a rule requiring them to send written confirmations if the churches were customers.  *Id.* at 363.  As the Commission's *amicus* brief in the matter explained, that rule was inapplicable because the churches "dealt with [the defendant] through a broker-dealer" and therefore "they were not customers" of the defendant.  Ex. 2 at 25 (Brief for the SEC, Amicus Curiae (No. 24500)).

Finally, to the extent that the Defendants are arguing that they specifically were misled by prior interactions with the Commission, that is both unsupported by the materials cited, *see* Section II, *supra*, and at most is a fact-based inquiry inappropriate at the motion to dismiss stage. *Rivard*, 2023 WL 5959305 at *6; *RFX, Inc. v. Florida Beauty Express, Inc.*, C.A. No. 21-cv-11612-AK, 2022 WL 1568445, at *3 (D. Mass. May 18, 2022).

Accordingly, Defendants had fair notice of the dealer registration laws as well as how courts and the Commission have interpreted them, and as such have not been denied due process.

## IV. The Commission has Pled a Valid Claim for Disgorgement, as Held by District Courts in Near-Identical Cases

There is no principled basis on which to dismiss the Commission's claim against the Defendants for disgorgement, nor do Defendants (or Amici) cite to any cases that provide

meaningful support for their argument.  Indeed, district courts have ruled in similar cases that

defendants must disgorge all profits generated from unregistered dealer activity.  *SEC v. Keener*,

644 F. Supp. 3d 1290, 1309 (S.D. Fl. 2022) (ordering unregistered dealer to disgorge net profits

from unlawful dealing of securities); *SEC v. Almagarby*, 2021 WL 4461831, at *3 (S.D. Fl.), 17-

62255-CIV (Aug. 16, 2021) (ordering unregistered dealer to disgorge net profits from unlawful

dealing of securities).  Since neither the Defendants nor Amici mention these cases in arguing

against disgorgement, they fail to explain how those cases are distinguishable.  They are not, and

counsel's argument should be rejected.

      In seeking dismissal of the Commission's claim for disgorgement, Defendants posit that

"other courts have repeatedly recognized" that "registration violations do not cause investor

victims" by citing to two cases involving different violations and other government agencies.

*Alvarez v. United States*, 862 F.3d 1297, 1302 (11th Cir. 2017) (rejecting tort claimant argument

that contractor's failure to register with the government -- not his Ponzi scheme -- proximately

caused investor harm); *CFTC v. Southern Trust Metals, Inc.*, 894 F.3d 1313, 1330 (11th Cir.

2018) (vacating restitution award for group of investors "whose losses were associated solely

with the registration violations" where applicable statute required proximate cause finding).  As a

threshold matter, there is no proximate causation requirement for disgorgement in SEC

enforcement actions (*SEC v. Teo*, 746 F.3d 90, 101-03 (3d Cir. 2014), because the goal of

disgorgement "is not to compensate for losses but to deprive the wrongdoer of his ill-gotten

gain." *Id*. (quoting *SEC v. Whittemore*, 659 F.3d 1, 11 n.2 (D.C. Cir. 2011)).  Nonetheless,

courts have found that failure to register as a dealer is, in fact, causally linked to illegal profits.

In *Keener*, the court rejected the defendant's contention that there was no causal relationship

between his earnings and his failure to register because the conduct would have been legal if he

had registered.  Finding "no merit" in his argument, the *Keener* court concluded that the

"violation was engaging in the business of regularly acquiring securities from issuers and

reselling those securities into the market without registering as a 'dealer.'  Thus, the profits

generated from these transactions are connected to [Keener]'s violation." *Id*. at 1304 (quoting

*Almagarby*, 2021 WL 4461831, at *3).  The Court not only found that the trading profits were

"the direct result of his illegal conduct" and thus "subject to disgorgement," but explained the

importance of imposing such a remedy for deterrence purposes.

> If accepted, Keener's position would significantly weaken the enforceability of Section
> 15(a)(1).  Under Keener's interpretation, an unregistered dealer of securities could retain
> all profits from systemic unlawful activity based on the theory that he could have
> obtained those profits had he complied with the law.  *For the registration requirement to
> be meaningful, nonregistered dealers cannot profit from their unlawful conduct*.

*Id.* (*emphasis added*).

In making their argument about disgorgement, Defendants lean into the idea that their

conduct would have been legal if they had registered, and thus disgorgement is inequitable.  This

argument should be rejected at the outset as counter-factual, since Defendants are only in this

position because they failed to register Auctus or the Auctus Fund as a dealer, and thus violated

the law.  Beyond that, this Court should decline to find at this stage that Defendants should be

permitted to retain all profits from their systemic unlawful activity based on the notion that they

could have engaged in the same activity if registered.  Such an argument is speculative at best,

because at this point the record is bereft of evidence that the Defendants could properly have

engaged in the violative conduct if registered with the Commission in the first place.

Particularly at the motion to dismiss stage, the Commission has sufficiently shown that

disgorgement is an applicable remedy.  Section 15(a) prohibits unregistered dealers from using

"any means or instrumentality of interstate commerce to effect any transaction in … any

security[.]" 15 U.S.C. § 78o(a)(1).  The Complaint states plainly that the Defendants were

engaging in the business of regularly acquiring securities from issuers and reselling billions of

shares without registering as a dealer.  Accordingly, the Defendants were unjustly enriched from

the profits obtained from those prohibited transactions, and the Commission has reasonably

shown that it has a valid basis for seeking the disgorgement of such profits.

## **CONCLUSION**

For the reasons stated above, the Defendants' Motion to Dismiss should be denied.


Dated:  October 6, 2023                                    Respectfully submitted,

                                                           */s Michael C. Moran*
                                                           Michael C. Moran (Mass. Bar No. 666885)
                                                           Rua M. Kelly (Mass. Bar No. 643431)
                                                           Michael P. Franck (Mass. Bar No. 668132)
                                                           Securities and Exchange Commission
                                                           33 Arch Street, 24th Floor
                                                           Boston, MA  02110
                                                           Phone: (617) 573-8900
                                                           Facsimile: (617) 573-4590
                                                           Email:  moranmi@sec.gov
                                                                    kellyru@sec.gov
                                                                    franckm@sec.gov



## **CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of October 2023, a copy of the foregoing was filed
electronically.  Notice of this filing will be sent by email to all parties of record by operation of
the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF
system.

                                                           */s Michael C. Moran*
                                                           Michael C. Moran