UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————

No.  24500

———————

EASTSIDE CHURCH OF CHRIST, ET AL.,

Appellants,

v.

NATIONAL PLAN, INC., ET AL.,

Appellees.

———————

BRIEF FOR THE SECURITIES AND EXCHANGE COMMISSION,
AMICUS CURIAE

———————

Philip A. Loomis, Jr.
General Counsel

Walter P. North
Associate General Counsel

Jacob H. Stillman
Special Counsel

Edward L. Lublin
Attorney

Securities and Exchange
  Commission
Washington, D. C. 20549

**S.A. 429**

I N D E X

Page

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . .   2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . .   6

  Introduction  . . . . . . . . . . . . . . . . . . . . . .   6

  I.  Transactions in Securities Issued by Churches
      Are Not Exempt from the Antifraud Provisions of
      the Securities Act of 1933 . . . . . . . . . . . . . .   8

  II. Transactions in Securities Issued by Churches Are
      Not Exempt from Either the Antifraud or the Broker-
      Dealer Registration Provisions of the Securities
      Exchange Act of 1934 . . . . . . . . . . . . . . . . .   8

  III. National Violated Section 15(a)(1) of the Securities
      Exchange Act of 1934 by Effecting Securities
      Transactions Without Registration as a Broker-
      Dealer . . . . . . . . . . . . . . . . . . . . . . . .   9

      A.  National Was a Broker . . . . . . . . . . . . . .   10

      B.  National Was a Dealer . . . . . . . . . . . . . .   12

      C.  National Violated Section 15(a)(1). . . . . . . .   16

  IV. Appellants May Void Any Transactions in Which
      National, Acting in Violation of Section 15(a)(1)
      of the Exchange Act, Purchased Securities from
      Them . . . . . . . . . . . . . . . . . . . . . . . . .   17

  V.  National Did Not Violate Rule 15c1-4 or Rule 15c2-4
      under the Exchange Act. . . . . . . . . . . . . . . .   25

      A.  Rule 15c1-4 . . . . . . . . . . . . . . . . . . .   25

      B.  Rule 15c2-4 . . . . . . . . . . . . . . . . . . .   26

i

CITATIONS

Page

Cases:

Brown v. Bullock, 194 F. Supp. 207, 225 (S.D. N.Y.),
aff'd 294 F.2d 415 (C.A. 2, 1961) . . . . . . . . . .      18

Downing v. Howard, 162 F.2d 654, 657-658 (C.A. 3, 1947) . .    18, 19

Geismar v. Bond & Goodwin, 40 F. Supp. 876, 878
(S.D. N.Y., 1941) . . . . . . . . . . . . . . . . .      18

Goldstein v. Groesbeck, 142 F.2d 422, 426-427 (C.A. 2,
1944), certiorari denied, 323 U.S. 737 (1944) . . . . . .     18, 19

Kardon v. National Gypsum Co., 69 F. Supp. 512, 514
(E.D. Pa., 1946) . . . . . . . . . . . . . . . . . .      18

Mills v. Sarjem Corporation, 133 F. Supp. 753, 769
(D. N.J., 1955) . . . . . . . . . . . . . . . . . .      22

Osborne v. Mallory, 86 F. Supp. 869, 879 (S.D. N.Y., 1949).     18

Progress Development Corporation v. Mitchel, 182 F. Supp.
681, 712 (N.D. Ill., 1960) . . . . . . . . . . . . . .      18

Statutes and Rules:

Public Utility Holding Company Act of 1935, 15 U.S.C.
79a, et seq.:

   Section 4(a)(2), 15 U.S.C. 79d(a)(2) . . . . . . . . . .    19
   Section 26(b), 15 U.S.C. 79z(b) . . . . . . . . . . . .    19

Securities Act of 1933, 15 U.S.C. 77a, et seq.:

   Section 3(a)(4), 15 U.S.C. 77c(a)(4) . . . . . . . . . .     8
   Section 17(a), 15 U.S.C. 77q(a) . . . . . . . . . . .      5, 7, 8
   Section 17(c), 15 U.S.C. 77q(c) . . . . . . . . . . .       8

Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.:

   Section 3(a)(4), 15 U.S.C. 78c(a)(4) . . . . . . . . . .    10
   Section 3(a)(5), 15 U.S.C. 78c(a)(5) . . . . . . . . . .    13
   Section 3(a)(12), 15 U.S.C. 78c(a)(12) . . . . . . . . .     9
   Section 3(a)(13), 15 U.S.C. 78(c)(a)(13) . . . . . . . .    15
   Section 10(b), 15 U.S.C. 78j(b). . . . . . . . . . . .      5
   Section 12(g), 15 U.S.C. 78l . . . . . . . . . . . . .      9
   Section 13, 15 U.S.C. 78m . . . . . . . . . . . . . .       9
   Section 14, 15 U.S.C. 78n . . . . . . . . . . . . . .       9

S.A. 431

                                                                    Page

Section 15(a)(1),  15 U.S.C. 78o(a)(1) . . . . . . . . . . .  3, 7, 9, 16, 17,
                                                             18, 20, 21, 22, 23, 24
Section 15(b), 15 U.S.C. 78o(b) . . . . . . . . . . . .
Section 15(b)(5), 15 U.S.C. 78o(b)(5)  . . . . . . . . . .     21
Section 15(b)(8), 15 U.S.C. 78o(b)(8)  . . . . . . . . . .     21
Section 15(c)(1), 15 U.S.C. 78o(c)(1)  . . . . . . . . . .     4, 5
Section 15(c)(2), 15 U.S.C. 78o(c)(2)  . . . . . . . . . .     4, 9, 20
Section 15(c)(3), 15 U.S.C. 78o(c)(3)  . . . . . . . . . .     20
Section 16, 15 U.S.C. 78p . . . . . . . . . . . . . . .        9
Section 17(a), 15 U.S.C. 78q(a) . . . . . . . . . . . . .      21
Section 28(a), 15 U.S.C. 78bb(a) . . . . . . . . . . . .       22
Section 29(b), 15 U.S.C. 78cc(b) . . . . . . . . . . . .       4, 17, 18, 20


Rules under the Securities Exchange Act of 1934:


   Rule 10b-5, 17 CFR 240.10b-5 . . . . . . . . . . . . . . .    5, 7
   Rule 15c1-1, 17 CFR 240.15c1-1 . . . . . . . . . . . . . .    25
   Rule 15c1-2, 17 CFR 240.15c1-2 . . . . . . . . . . . . . .    5, 7
   Rule 15c1-4, 17 CFR 240.15c1-4 . . . . . . . . . . . . . .    4, 7, 25
   Rule 15c2-4, 17 CFR 240.15c2-4 . . . . . . . . . . . . . .    4, 7, 26

Miscellaneous:

2 Loss, Securities Regulation (2d ed. 1961)  . . . . . . .    11, 14
Hearings on S. 3255 and H.R. 9634 Before a Subcommittee
 on the House Committee on Interstate and Foreign Commerce,
 75th Cong., 3d Sess. (1938) . . . . . . . . . . . . . . .     20
S. Rep. No. 1455, 75th Cong., 3d Sess. (1938)  . . . . . .     20
6 Williston, Contracts (rev. ed. 1938) . . . . . . . . . .    19, 20

iii

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————

No.   24500

———————

EASTSIDE CHURCH OF CHRIST, ET AL.,

Appellants,

v.

NATIONAL PLAN, INC., ET AL.,

Appellees.

———————

BRIEF FOR THE SECURITIES AND EXCHANGE COMMISSION,
AMICUS CURIAE

———————

Pursuant to the request of this Court, the Securities and
Exchange Commission submits this brief as amicus curiae in response
to the questions set forth in the Court's "Memorandum to Counsel
as to Supplemental Briefs" dated November 8, 1967. In participating
as amicus curiae, the Commission, as a matter of policy, takes no
position on any factual disputes in the case but expresses its views
only on questions involving the interpretation and application of
the federal securities laws.

**S.A. 433**

-2-

## STATEMENT OF THE CASE

This is an appeal from a decision of the District Court for the Northern District of Texas. The appellants, seven churches, are seeking recovery against the two appellees, National Plan, Inc. [National], and National's principal owner, Robert H. Knox. The churches, asserting that they never received payment for certain bonds which they issued and which were purchased by National, claim that they are entitled to recover the bonds which are still in National's possession and that they are entitled to damages with respect to any of the bonds which have been transferred by National into the hands of innocent purchasers. National, on the other hand, claims that the bonds are valid obligations of the churches in the hands of both National and its transferees.

National acquired the bonds in the following manner: Glenn V. Paden, a church contractor, agreed to construct buildings for each of the appellant churches. To finance the construction of the buildings, the churches issued bearer bonds to Paden, either selling them to him outright or delivering them to him as agent to "place" the bonds on behalf of the churches (R. 305). The churches claim that Paden was obligated to remit to them the full face value of the bonds, without commission, either promptly or, in the case of certain of the bonds, as the money would be needed for construction of the buildings (R. 305). Paden sold approximately $215,000 face

**S.A. 434**

-3-

amount of the bonds to National at a discount of either 10% or 15% from their face amount (R. 286, 315-318). National, as directed by Paden, paid for the bonds either directly to Paden or to a company called World Oil & Gas of Delaware, Paden having told National that World Oil & Gas would absorb the discount and pay Paden the full face value of the bonds as he needed it for the church construction projects (R. 179, 195, 196, 317). The churches claim that they never received the proceeds for the bonds purchased by National (R. 302-303). [1]/

The churches claim that National purchased the bonds in violation of three provisions of the federal securities laws. First, they assert that National was an unregistered broker-dealer and, accordingly, that National's purchases of the bonds violated Section 15(a)(1) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78o(a)(1), prohibiting an unregistered broker-dealer from effecting securities transactions. Second, they claim that National

---

[1]/ National disputes certain of these allegations. As noted earlier, we take no position on such factual questions but merely assume, for purposes of discussing the legal issues in the case, that the facts are as stated above.

With respect to certain of the bonds which National acquired, Paden's connection, if any, with the transactions is unclear. Thus, it appears that $18,500 of the bonds were sold to National by George Edward Johnson and W. R. McDonald, and the record does not indicate Paden's relationship with these individuals.

-4-

violated the antifraud provisions in Section 15(c)(1) of the Exchange Act, 15 U.S.C. 78o(c)(1), and Rule 15cl-4 thereunder, 17 CFR 240.15cl-4, by failing to send written confirmations of the purchases to the churches.  Third, they claim that National violated the antifraud provisions in Section 15(c)(2) of the Exchange Act, 15 U.S.C. 78o(c)(2), and Rule 15c2-4 thereunder, 17 CFR 240.15c2-4, in that it neither transmitted its purchase payments directly to the churches nor deposited the money in a separate bank account or in an escrow account for their benefit.  The churches claim that, as a result of these violations, National's purchases of the bonds are void under Section 29(b) of the Exchange Act, 15 U.S.C. 78cc(b), thus entitling the churches to the relief sought.

Although the seven churches, National and Knox are the only parties to this appeal, the action below involved a number of additional parties.  The action was brought by 22 churches, including the seven involved in this appeal, all of them seeking recovery as a result of an alleged failure to receive payment for bonds which they had issued. National, although not named as a defendant in the original complaint, later intervened in the action seeking a declaration that the bonds which had been issued by the seven appellant churches and purchased by National were valid and subsisting obligations of the issuers and that none of the issuers had a valid claim against any of the bonds or a valid defense to their payment in the hands of National or its transferees.  Subsequent to National's intervention, the complaint

**S.A. 436**

-5-

was amended to add Knox, National's principal owner, as a defendant and to assert claims against Knox and National.

The amended complaint, in addition to charging the three violations noted earlier, alleged that National and Knox, together with all of the other defendants (Paden and World Oil & Gas were among the many defendants) participated in a conspiracy to defraud the 22 plaintiffs in violation of Section 17(a) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77q(a), and of Sections 10(b) and 15(c)(1) of the Exchange Act, 15 U.S.C. 78j(b), 78o(c)(1), and Rules 10b-5 and 15cl-2 thereunder, 17 CFR 240.10b-5, 15cl-2. Specifically, it was alleged that the churches had transferred their bonds to Paden and that thereafter he and other defendants used the bonds for their own purposes and sold them to various persons including National without making payment for the bonds to the churches.

After a separate hearing was held with respect to claims involving defendants National and Knox, judgment was entered in their favor denying relief to plaintiffs. The judgment also contained a declaration that the bonds acquired by National were valid obligations of the seven churches which had issued them and that the churches had no valid claim to any of such bonds or a valid defense to their

-6-

payment in the hands of National or its transferees (R. 333-334).
The Court concluded that National acquired the bonds as a holder in
due course; that there was no showing of bad faith or fraud on the
part of National in its acquisition of the bonds; that National did
not violate the antifraud provisions or have knowledge of any such
violation; that there was no violation of the broker-dealer regis-
tration provisions of the Exchange Act because the bonds were exempt
securities; and that "if any violation of the securities laws occurred
in connection with the sale of the bonds to intervenor [National],
intervenor participated in no fraudulent act, and any such violation
did not materially deny to plaintiff churches any protection which
the securities laws were designed to afford" (R. 327-28, 333-34).
The seven churches have appealed from this judgment.

## ARGUMENT

### Introduction

In responding to the questions set forth in the Court's
Memorandum to Counsel, we will first discuss the applicability of
the Securities Act of 1933 and the Securities Exchange Act of 1934
to transactions in bonds issued by churches. We will then discuss
the specific violations which appellants allege that National com-
mitted.

-7-

As noted above, it appears that on this appeal appellants are not pressing their claims, which they alleged in the District Court, that defendants violated Section 17(a) of the Securities Act and Rules 10b-5 and 15cl-2 under the Exchange Act. Appellants assert that the District Court erred in considering those claims at the hearing below — a hearing which, according to appellants, was limited to the question of determining title to the bonds. Appellants apparently are of the view that the only violations which should be considered in determining title are those alleged under the broker-dealer registration provisions in Section 15(a)(1) of the Exchange Act and under the antifraud provisions in Rules 15cl-4 and 15c2-4. We have difficulty in accepting this position that the other violations are separable from the question of title, for it seems clear that if National acquired the bonds through participation in the fraudulent scheme alleged in the complaint, in violation of Section 17(a) and Rules 10b-5 and 15cl-2, National could not be a holder in due course. The District Court, however, concluded that National did not violate any of the antifraud provisions, and under these circumstances we will limit our discussion of violations to the three which appellants are now asserting.

S.A. 439

-8-

I.  Transactions in Securities Issued by Churches Are Not Exempt
    from the Antifraud Provisions of the Securities Act of 1933.

        The antifraud provisions in Section 17(a) of the Securities
Act of 1933 contain no exemption for securities issued by churches.
The exemption for church securities contained in Section 3(a)(4)
of that Act, 15 U.S.C. 77c(a)(4), is expressly made inapplicable
to the antifraud provisions by Section 17(c), 15 U.S.C. 77q(c),
which declares that "the exemptions provided in section 3 shall not
apply to the provisions of this section [Section 17]."

        In view of the foregoing, the exemption for church bonds
contained in Section 3(a)(4) is an exemption only from the regis-
tration provisions of the Act and not from the Act's antifraud pro-
visions.  Since, in the present case, no violation of the regis-
tration provisions has been alleged, this exemption is inapplicable.

II.  Transactions in Securities Issued by Churches Are Not
     Exempt from Either the Antifraud or the Broker-Dealer
     Registration Provisions of the Securities Exchange Act
     of 1934.

        The provisions of the Securities Exchange Act of 1934 which
are involved in this case — the antifraud and the broker-dealer
registration provisions — contain no exemption for securities issued
by churches.  While the broker-dealer registration provisions and

S.A. 440

-9-

certain of the antifraud provisions [2/] do provide that they are
inapplicable to an "exempted security," the term "exempted security"
is defined in Section 3(a)(12) of the Act, 15 U.S.C. 78c(a)(12),
and does not include church bonds.  Section 12(g)(2)(D) of the Act,
15 U.S.C. 78l(g)(2)(D), contains an exemption for church bonds, but
that exemption relates only to the registration, reporting, proxy
and insider trading requirements applicable to certain over-the-
counter securities [3/] and does not relate to the antifraud or broker-
dealer registration provisions.

III.  National Violated Section 15(a)(1) of the Securities
      Exchange Act of 1934 by Effecting Securities Transactions
      Without Registration as a Broker-Dealer.


       Section 15(a)(1) of the Exchange Act provides:

       No broker or dealer (other than one whose business is
       exclusively intrastate) shall make use of the mails
       or of any means or instrumentality of interstate com-
       merce to effect any transaction in, or to induce the
       purchase or sale of, any security (other than an exempted
       security or commercial paper, bankers' acceptances, or
       commercial bills) otherwise than on a national securities
       exchange, unless such broker or dealer is registered in
       accordance with subsection (b) of this section.

---

2/   Sections 15(a)(1) and 15(c)(2), 15 U.S.C. 78o(a)(1) and 78o(c)(2).

3/   Sections 12(g), 13, 14 and 16, 15 U.S.C. 78l(g), 78m, 78n and
     78p.

**S.A. 441**

-10-

The question whether National violated the foregoing provision
depends on whether or not, on the facts in this record, National
was a "broker" or "dealer" within the meaning of the Exchange Act.
The District Court did not reach this question, having erroneously
concluded that church bonds are exempt securities for purposes of
the broker-dealer registration provisions.

A.  National Was a Broker.

Section 3(a)(4) of the Exchange Act, 15 U.S.C. 78c(a)(4),
defines a "broker" as "any person engaged in the business of effecting
transactions in securities for the account of others. . . ."

With respect to the business of National, Knox testified as
follows (R. 29-30, 61):

> Q  Would you describe just generally the nature
> of the business of National Plan?
>
> A  National Plan is a chartered company which
> operates under the laws of the State of Texas, and
> we put on bond issues to build churches.  That is
> our principal business.
>
> Q  Would you tell us—tell the Court just what
> you do with reference to these bond issues for
> church buildings?
>
> A  When we go to a congregation, they ask us to
> put on the bond program for them, and we assist them
> in doing all of the legal work concerning the bond
> program.  We do the printing of all of it.  We incor-
> porate the church in the State of Texas in case they're

-11-

not incorporated.  We handle all of the paper work
for them and we act as the fiscal agent and the
trustee of the property and we direct their sales
of bonds in the bond programs.

*       *       *

Q  . . . [W]hat was your business?

A  Principally bond issues, putting on bond programs.

Q  Then you would telephone back and forth, as we
stipulated, in Interstate Commerce, would you not, and
you would go up there and see them and advise them to
sell the bonds, is that correct?

A  Director of sales.

Q  Throughout the country?

A  Yes.

The Exchange Act, as noted above, defines a broker as one

who is "engaged in the business" of performing certain activities.

The term "business" connotes some regularity of participation in

the specified activities rather than a few isolated transactions. [4/]

Since the record shows that National was engaged on a regular

basis in performing bond programming services for churches, the

question whether National was a broker depends on the nature of

those services.

---

4/  2 Loss, Securities Regulation 1295 (2d ed. 1961).

-12-

In our view the phrase "effecting transactions in securities," as used in the Exchange Act's definition of broker, is not limited to the actual solicitation of prospective customers. It covers a broad range of activities involving securities transactions. In the present case, the record shows that National, in providing its services to a church, made all the necessary arrangements for the issuance of the church's bonds and acted as "director of sales." It seems reasonable to conclude that, at the very least, National participated in the organization of the bond sales program and of the sales force; and National states in its brief that it trained the salesmen in selling techniques and kept records of the salesmen's performance for follow-up purposes. Thus, National was actively involved in the selling activities and exercised influence over the method and manner of solicitation. Under these circumstances, we believe that National was a broker within the meaning of the Exchange Act.

### B.  National Was a Dealer.

If this Court agrees with our conclusion that National was a broker, there will be no need to determine whether National also falls within the definition of dealer, since the registration requirement is applicable if it was either a broker or a dealer.

S.A. 444

-13-

Section 3(a)(5) of the Exchange Act, 15 U.S.C. 78c(a)(5),
provides that the term "dealer" means "any person engaged in the
business of buying and selling securities for his own account,
through a broker or otherwise, but does not include . . . any person
insofar as he buys or sells securities for his own account, either
individually or in some fiduciary capacity, but not as a part of a
regular business."

With respect to National's purchases and sales for its own
account, the record shows that in nine transactions occurring between
May and October 1965, National, using funds borrowed from a bank,
purchased from Paden, Johnson and McDonald the $215,000 of bonds
which were issued by the seven appellant churches and which are the
subject of this appeal (R. 27-28, 35-47). "Part" of these bonds were
purchased by National for the purpose of re-sale (R. 62); and by
September 1966, National had, in fact, re-sold $82,700 of the bonds
to 17 persons in seven states (R. 66; Exh. A to National's First
Amended Answer and Cross-Complaint in Intervention).

The record further shows that when Knox bought National in
March 1964, the company was indebted to a bank for $185,400 on a
loan secured by church bonds (R. 59-60). "From time to time"
National received church bonds as fees for its bond programming
work (R. 51). In 1964, National "might have bought a few bonds"
and "might have sold a few" of the bonds it had received as fees

-14-

(R. 61). Between January and April 1965, in four transactions,
National purchased from Paden $40,000 to $50,000 of church bonds
prior to purchasing the $215,000 of bonds involved herein (R. 31-
34, 62). Knox testified that except for its purchases from
Paden, Johnson and McDonald, National did not "make it a regular
practice to buy large amounts of bonds" and that the transactions with these
persons were "the only purchases" by National "of any substantial
amount of bonds from any individual through the years" (R. 51, 84).
On April 15, 1966, National's assets included $156,800 of church
bonds, "held for sale," and $31,201.35 of notes receivable secured
by church bonds (Plaintiffs' Exh. 1; R. 67).

The Exchange Act's definition of dealer, as noted above,
uses the terms "engaged in the business" and "part of a regular
business." In determining whether National falls within this
definition, the question involved is essentially that of distinguishing
between a person who buys and sells securities as part of a business
and an ordinary trader or investor who buys and sell securities with
some frequency but not as part of a business. There are various
characteristic attributes of a dealer. [5/] If the situation here were
one in which National's securities transactions were not part of some
other business in which it was engaged, it might be necessary to consider

_____

[5/]  See 2 Loss, <u>Securities Regulation</u> 1297 (2d ed. 1961).

-15-

these various attributes in order to determine whether National's securities transactions were of such a nature as to bring National within the definition of dealer.  Even in that situation, however, it should be noted, as Professor Loss has pointed out, that "a person does not have to exhibit all or any given number of these . . . characteristics in order to be considered a dealer." [6/]  In the present case, however, it is not necessary to consider the various dealer characteristics, in view of the fact that National was engaged in the bond programming business and National's securities transactions cannot be divorced from that business.  Indeed, some of National's purchases of securities consisted of the receipt of church bonds as fees for its bond programming services. [7/]  And, while the securities which are the subject of this appeal were not acquired in that manner—National did not perform such services for the churches involved here—the fact that both National's transactions for its own account and its bond programming activities involved church bonds makes it unrealistic to view the former transactions as being separable from the latter activities.  In view of this close relationship between its securities transactions and its bond programming business, those transactions must be deemed a part of that business, and accordingly National was a

---

[6]/  **Ibid.**

[7]/  The receipt of securities as a fee for services performed constitutes a "purchase" within the meaning of Section 3(a)(13) of the Exchange Act, 15 U.S.C. 78c(a)(13), which provides that the term "purchase" includes "any contract to buy, purchase, or otherwise acquire."

**S.A. 447**

-16-

dealer within the meaning of the Exchange Act.

Since National was a dealer because its transactions for its own account were part of its bond programming business, this Court need not consider the question whether such transactions would, apart from its bond programming business, have been sufficient to constitute it a dealer. In view of the extensive nature of National's transactions commencing in 1965 — approximately $260,000 of bonds purchased in 13 transactions and $82,700 of bonds sold to 17 persons located in seven states — National might well have been a dealer by virtue of these transactions alone.

C.  National Violated Section 15(a)(1).

The parties are in agreement that the intrastate exemption in Section 15(a)(1) is unavailable here and that the mails and instrumentalities of interstate commerce were used in connection with National's purchases of the $215,000 of bonds here involved. Accordingly, if National was either a broker or a dealer at the time when those transactions occurred in 1965, it violated Section 15(a)(1) by effecting the transactions while unregistered. For the reasons stated in Part A, supra, we believe that National was a broker by virtue of the bond programming activities which have been National's principal business since 1964. Therefore, the purchases with respect to which the appellants are seeking relief were in violation of Section 15(a)(1).

Even if National was not a broker, it violated Section 15(a)(1), for, as pointed out in Part B, supra, we believe that National was a dealer. With respect to the time when National became a dealer,

**S.A. 448**

-17-

it might be argued that National did not become a dealer until the $82,700 in sales took place.  However, in view of Knox's testimony that some of the $215,000 in purchases were made for the purpose of resale and the fact that $82,700 of the bonds were in fact resold, we believe that, if it is determined that National was a dealer, the evidence establishes that National was a dealer not only at the time of its sales but also at the time of the challenged purchases.

IV. <u>Appellants May Void Any Transactions in Which National, Acting in Violation of Section 15(a)(1) of the Exchange Act, Purchased Securities from Them.</u>

Section 29(b) of the Exchange Act provides that "every contract made in violation of any provision of this title . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract. . . ." Since the $215,000 of bonds here involved were purchased by National in violation of Section 15(a)(1) of that Act, the transactions are void and National is liable in rescission and for money damages.  Section 29(b) clearly contemplates a civil suit for such relief based on

-18-

violations of the Act.[8]

   National urges, however, that appellants are not entitled
to relief unless they can establish that any harm which they
suffered was caused by National's failure to register.  In our view
there is no such requirement.  We submit that National's "causation"
argument is contrary to the express mandate of the statute and to
the Congressional intent and that, if accepted, it would seriously
weaken the enforcement of the broker-dealer registration provisions.

   Under Section 15(a)(1), National was prohibited from effecting
the transactions here involved.  National violated the Act by
entering into those transactions.  Under the voiding provision of
Section 29(b) it is sufficient to show only that the prohibited
transactions occurred.  To impose a further requirement that appel-
lants prove that their harm was caused by National's failure to
register would be contrary to the language of both Section 15(a)(1)
and Section 29(b).  This position is in accord with

---

8/  <u>Kardon</u> v. <u>National Gypsum Co.</u>, 69 F. Supp. 512, 514 (E.D. Pa.,
    1946); <u>Osborne</u> v. <u>Mallory</u>, 86 F. Supp. 869, 879 (S.D. N.Y., 1949);
    <u>Geismar</u> v. <u>Bond & Goodwin</u>, 40 F. Supp. 876, 878 (S.D. N.Y., 1941).

    For holdings under similar provisions of the Investment Company
    Act of 1940, see <u>Progress Development Corporation</u> v. <u>Mitchel</u>, 182
    F. Supp. 681, 712 (N.D. Ill., 1960); <u>Brown</u> v. <u>Bullock</u>, 194 F. Supp.
    207, 225 (S.D. N.Y., 1961), <u>aff'd</u>, 294 F. 2d 415 (C.A. 2, 1961).

    For a holding under similar provisions of the Public Utility
    Holding Company Act of 1935, see <u>Goldstein</u> v. <u>Groesbeck</u>, 142 F. 2d
    422, 426-427 (C.A. 2, 1944), <u>certiorari denied</u>, 323 U.S. 737 (1944).
    <u>But cf.</u> <u>Downing</u> v. <u>Howard</u>, 162 F.2d 654, 657-658 (C.A. 3, 1947).

**S.A. 450**

-19-

the decision in <u>Goldstein</u> v. <u>Groesbeck</u>, 142 F. 2d 422 (C.A. 2, 1944),

<u>certiorari denied</u>, 323 U.S. 737 (1944), construing the similar

voiding provision in Section 26(b) of the Public Utility Holding

Company Act of 1935, 15 U.S.C. 79z(b). Relief was there sought with

respect to an alleged violation of Section 4(a)(2) of the Holding

Company Act, 15 U.S.C. 79d(a)(2), which makes it unlawful for an

unregistered holding company to enter into certain types of con-

tracts with any public-utility company. The Court stated, 142

F. 2d at 426:

> Violation being thus established, § 26(b) . . . in
> express terms declares the contracts void. It should
> follow that the operating companies are entitled to a
> refund, for no other result can fulfill the expressed
> purpose of the Act of protecting subsidiaries from the
> overreachings of holding companies.

But <u>cf</u>. <u>Downing</u> v. <u>Howard</u>, 162 F. 2d 654, 657-658 (C.A. 3, 1947).

The present case is even a stronger one for permitting rescission

than was <u>Goldstein</u>. Here we are dealing with a form of occupational

or professional licensing, and rescission is a generally accepted

remedy for failure to comply with statutes requiring such licensing. <u>9/</u>

_____

9/ As Professor Williston points out:

> Where a statute requires a broker to obtain a license
> before sales of the kind in question can be negotiated
> by him, there is no doubt that if such a sale is made
> by one acting as a broker without the required license,
> he can recover no compensation for his services, in
> spite of the fact that the license has been procured
> before the commissions become due. And even though
> sale of particular goods is not illegal in itself, if

footnote cont'd

S.A. 451

-20-

While it may appear to be a harsh remedy to void a transaction solely on the ground that it was effected by an unregistered broker-dealer, we believe that this remedy is precisely what Congress intended and is essential to the effective enforcement of the broker-dealer registration provisions. When Congress did not want Section 29(b) to be applicable to certain violations, it so provided in express terms, as it did in the case of violations of rules pre-scribed pursuant to Sections 15(c)(2) and 15(c)(3). [10/]   We submit that the failure similarly to exclude violations of Section 15(a)(1) from the operation of Section 29(b) is a reflection of the vital importance which Congress attached to the broker-dealer registration provi-sions and demonstrates that proof of causation is not required. For,

---

> the seller is violating the law in selling them
> without complying with some statutory prerequisite,
> the policy of the law generally denies recovery of
> the price. Indeed, recovery of the price may be
> denied even when the only illegality is breach of a
> requirement under statutory penalty that the seller
> shall take out a license, if the purpose of the statute
> is, in part at least, for the protection of the public
> and not solely for purposes of revenue. For example,
> statutes have been passed regulating the sale of
> corporate stock, requiring the approval of certain
> state officers, or the licensing of the salesmen of
> the stock. Agreements made in violation of such
> statutes are generally held to be void; the seller
> cannot recover the price, but the buyer may recover
> that part of the price he has paid.

6 Williston, Contracts (rev. ed. 1938), § 1765, at 5008-12
(emphasis added, footnotes omitted).

10/   See S. Rep. No. 1455, 75th Cong., 3d Sess. 10 (1938); Hearings
on S. 3255 and H.R. 9634 Before a Subcommittee of the House
Committee on Interstate and Foreign Commerce, 75th Cong., 3d
Sess. 36-43 (1938).

S.A. 452

-21-

contrary to National's assertion that Section 15(a)(1) involves
only a "technical" violation, [11]/  it is clear that the require-
ment of registration lies at the heart of the statutory scheme of
broker-dealer regulation.  While many of the Exchange Act's pro-
visions apply to all broker-dealers, whether registered or not, it
is through the registration requirement that dishonest and irre-
sponsible persons are excluded from the securities business, [12]/  that
standards may be established with respect to training and exper-
ience, [13]/  that certain financial reports are required to be sub-
mitted to the Commission, and that certain books and records are required
to be maintained and are subject to examination by the Commission. [14]/

      Private rights of action for violation of the federal
securities laws serve both as a supplement to the Commission's own
enforcement remedies, thus adding to their deterrent effect, and
as a means of compensating persons who are injured by violations.
To condition the availability of private relief for a violation
of Section 15(a)(1) upon a showing that the harm suffered was
caused by the failure to register would reduce the deterrent effect

---

11/  Supplemental Brief of Appellees, pp. 16, 22.

12/  Section 15(b)(5), 15 U.S.C. 78o(b)(5).

13/  Section 15(b)(8), 15 U.S.C. 78o(b)(8).

14/  Section 17(a), 15 U.S.C. 78q(a).

-22-

of the private right of action and would deprive injured members
of the public of an effective means of redress. A failure to
register might well be a cause of the harm suffered, yet the diffi-
culties in proving such a causal connection would ordinarily be
insuperable. The only effective remedy is one which permits
rescission simply upon a showing that the transaction
occurred when the broker-dealer was not registered.[15]

The parties appear to be in disagreement as to whether Paden
received the bonds here involved as agent for appellants to sell on
their behalf, or whether he purchased the bonds outright and then
resold them. With respect to any bonds received by Paden as agent,
appellants were, of course, parties to the subsequent transactions
with National and are therefore entitled to rescission as a result
of National's violation of Section 15(a)(1). With respect to any
bonds which Paden purchased outright and then resold, we believe
that, on the facts of this case and in view of the nature of the
violation here involved, appellants cannot rescind. We do not mean
to suggest that privity of contract would necessarily be a prereq-
uisite to recovery in other contexts under the federal securities
laws, such as in the fraud area. For example, if a person makes
material misrepresentations which are relied upon by or which other-
wise cause harm to another, the absence of privity between the two

---

[15] **Contra**, **Mills** v. **Sarjem Corp.**, 133 F. Supp. 753, 769 (D. N.J., 1955).

There is no inconsistency between the position we are urging and
the provisions of Section 28(a) of the Exchange Act, 15 U.S.C. 78bb(a).
Section 28(a) was intended to preclude double recovery; it does not
require proof of a causal connection between the harm suffered and
the failure to register.

S.A. 454

-23-

persons should not preclude recovery under the antifraud provisions.
In the present case, however, there does not appear to be a suf-
ficient connection between National's violation and the appellants
to permit them to rescind transactions to which they were not
parties.  Similarly, appellants may not rescind with respect to the
bonds which National purchased from Johnson and McDonald, since the
record does not show any connection between appellants and those
two individuals.

National urges that whatever right of rescission appellants
might otherwise have, they cannot recover because their agent, Paden,
was himself an unregistered broker-dealer acting in violation of
Section 15(a)(1).  In our view this argument is without merit.  The
major purpose of broker-dealer registration is to regulate persons
engaged in the securities business for the protection of those who
deal with them.  It would be ironic indeed, in this suit between
National, which was a broker-dealer, and the appellant churches, who
were not in the securities business, to deny relief to the latter on
the ground that their agent failed to comply with the registration
requirement. 16/

---

16/  National also suggests that appellants cannot recover because
they themselves violated the antifraud provisions by falsely
stating on the face of the bonds that payment had been received.
This argument appears to involve essentially factual questions
as to the falsity of the statement and National's reliance upon
it.  As noted earlier, we take no position on such factual issues.

-24-

Appellants claim that, if National violated Section 15(a)(1), they are entitled to recover the bonds from National (and to obtain damages for the bonds which National sold to innocent purchasers) without refunding to National the consideration which it paid for the bonds. Appellants take this position in view of their assertion that they never received the money that National paid. The District Court, however, was apparently of the view that the payments which National made to Paden, and to World Oil & Gas in accordance with Paden's instructions, constituted valid payment for the bonds. The Court found that "[c]ertain of the bonds purchased by [National] were sent by the Churches to Paden who had been given authority by the churches to sell the bonds and to collect the sale proceeds." The District Court further concluded that "[w]hile the purchase of bonds at a discount and the payment of certain proceeds to World Oil and Gas combined are suspicious circumstances, they are not of such a substantial character as to charge [National] with notice that Paden had exceeded his authority, nor are they sufficient to charge [National] with the duty to make further inquiry of the Churches as to the extent of Paden's authority." Although it is not entirely clear, the District Court made this finding presumably on the assumption that National was not a broker or dealer. In view of our conclusion that National was a broker-dealer, we believe that it would be appropriate to reconsider the

-25-

question of notice and duty of inquiry in the light of this additional factor. The fact that National was a broker-dealer is a relevant circumstance which should be considered together with the other surrounding circumstances in determining whether National was on notice that Paden had exceeded his authority and was under a duty to make further inquiry.

V.   **National Did Not Violate Rule 15c1-4 or Rule 15c2-4 Under the Exchange Act.**

A.  **Rule 15c1-4**

Appellants assert that National violated Rule 15c1-4 by failing to send them written confirmations of its purchases. This rule, however, requires that a confirmation be sent by a broker or dealer to its "customer." Since appellants dealt with National through a broker-dealer, Paden, [17/] they were not customers of National within the meaning of the rule, and accordingly National was not required to send confirmations to them. Nor was National required to confirm to Paden, since Rule 15c1-1(a), 17 CFR 240.15c1-1(a), provides that "the term 'customer' shall not include a broker or dealer." Therefore National did not violate Rule 15c1-4.

---

[17/]  All parties to this appeal agree that Paden was a broker-dealer, albeit not registered as such with the Commission.

-26-

### B. Rule 15c2-4

Rule 15c2-4 deals with a situation in which a "broker or dealer participating in a distribution of securities, other than a firm-commitment underwriting, . . . accept[s] any part of the sale price of any security being distributed . . . ." The rule requires the broker or dealer either to transmit the money promptly to the persons entitled thereto or, if payment to such persons is not to be made until some further event or contingency, to do either of two things with the money:  (1) deposit it in a separate bank account, as agent or trustee for the persons who have the beneficial interests therein, until the event or contingency has occurred, and then promptly transmit the money to the persons entitled thereto; or (2) place the money in escrow with a bank for the benefit of the persons entitled thereto.  Thus, the rule applies to a situation in which a broker-dealer receives money that rightfully belongs to others.  The purpose of the rule is to safeguard such funds and to assure that they reach the rightful owners.  National, however, bought the bonds here involved for its own account and made payment with its own funds.  Accordingly, we do not believe that the evidence is sufficient to establish that the rule is applicable to the situation here involved.

-27-

Respectfully submitted,

Philip A. Loomis, Jr.
General Counsel

Walter P. North
Associate General Counsel

Jacob H. Stillman
Special Counsel

Edward L. Lublin
Attorney

Securities and Exchange Commission
Washington, D. C.  20549

February 1968

**S.A. 459**