UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | |
| Plaintiff, | ) ) ) | Civil Action No. 23-cv-11233-AK |
| v. | ) ) | |
| AUCTUS FUND MANAGEMENT, LLC; LOUIS J. POSNER; and ALFRED SOLLAMI, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER
ON DEFENDANTS' MOTION TO DISMISS**

**ANGEL KELLEY, D.J.**

This case is part of a raft of cases brought by the U.S. Securities and Exchange Commission ("the SEC" or "the Commission") alleging that individuals and entities whose business it is to buy and sell shares of securities pursuant to convertible loan agreements are securities "dealers" and must be registered as such with the Commission. Specifically, the SEC alleges that Defendants engaged in securities dealing without being registered with the Commission in violation of 15 U.S.C. § 78c(a)(5)(A) and 15 U.S.C. § 78t(b) (Counts I and II) and requests disgorgement pursuant to 15 U.S.C. §78u(d)(7) (Count III). [Dkt. 1]. The SEC further requests a permanent injunction and prejudgment interest on the allegedly ill-gotten gains. On September 8, 2023, Defendants filed a motion to dismiss for failure to state a claim. [Dkt. 25]. On October 2, 2023, an amicus brief was filed by the Alternative Investment

1

Management Association, Ltd. and the National Association of Private Fund Managers, Trading and Markets Project, Inc. in support of Defendant's motion to dismiss. [Dkt. 37]. Several days later, the SEC opposed the motion to dismiss, and Defendants filed a timely reply. [Dkts. 38; 39]. Both parties subsequently filed notices of supplemental authorities. [Dkts. 59; 62]. For the reasons stated below, Defendants' Motion to Dismiss [Dkt. 25] is **DENIED**.

I. BACKGROUND

The following summary is based upon allegations in the complaint which are accepted as true for the purposes of the Court's consideration of the motion to dismiss. Barchock v. CVS Health Corp., 886 F.3d 43, 48 (1st Cir. 2018).

Defendant Auctus Fund Management, LLC ("Auctus") is a limited liability company created in 2016 as a successor entity to Auctus Fund Management Inc., which was created in 2008 with a principal place of business in Boston, Massachusetts. [Dkt. 1 ¶ 12]. Defendants Alfred Sollami ("Sollami") and Louis Posner ("Posner") own 51% and 49% of Auctus, respectively. [Id.]. Sollami and Posner, through Auctus, control a hedge fund called Auctus Fund LLC ("the Fund"). [Id. ¶ 2]. At all relevant times, Posner was Managing Director of the Fund and Sollami was a Managing Member of Auctus. [Id. ¶¶ 13-14].

Between 2013 and 2021, Defendants entered into Securities Purchase Agreements with companies that traded on the public market, typically developmental-stage, cash-poor companies with limited options for financial lending. [Id. ¶¶ 16, 22]. The Securities Purchase Agreements stipulated that the Fund would lend the issuer money in exchange for a convertible promissory note ("Note"). [Id. ¶ 16]. Generally, the Note required the issuer to repay a specified amount with interest within nine months to a year, with an option to prepay subject to a 30% to 50% premium of the value of the Note. [Id. ¶ 18]. After six months, the issuer lost the ability to

prepay the Note without the Defendants' consent. [Id.]. However, Defendants could convert the amount due under the Note into shares of the company's stock at a significant discount, typically between 30% and 50% lower than the lowest price at which the shares were trading in the days preceding each stock conversion. [Id.]. Starting no later than 2018, many of Auctus' Securities Purchase Agreements required issuers to issue warrants to Auctus which gave Auctus the right to purchase the issuer's stock at a specific price within a specified time period. [Id. ¶ 19].

In 2015, Defendants received or deposited through the Fund approximately 4 billion shares of stock from convertible note deals. In 2020, that number grew to 27.6 billion shares. [Id. ¶ 29]. Between 2013 and 2021, Defendants engaged in more than one hundred Securities Purchase Agreements in return for Notes, exercised their conversion rights to obtain more than 60 billion shares of stock and sold more than 60 billion shares of stock into the market, generating more than $100 million in profits. [Id. ¶¶ 16, 38]. During that time, Defendants identified and solicited customers through third parties and responded to customer inquiries regarding their financing. [Id. ¶ 33]. In 2021, Defendants ceased entering into new Notes with built-in discount rates of 30% to 50% but continued to exercise their rights as to already-issued Notes. [Id. ¶ 38].

At all relevant times, Posner and Sollami possessed and exercised the ultimate decision-making power over Auctus, including the power to decide whether to enter into each of the Notes, to negotiate and approve the final deal terms, and to monitor the status of Auctus' investments and its sales of stock, including when and whether to convert under the Notes. Posner and Sollami also controlled both Auctus' and the Fund's bank and brokerage accounts. [Id. ¶ 32]. Additionally, Sollami had primary responsibility for interreacting and communicating with current and prospective investors in Auctus. [Id. ¶ 36]. At no time between 2013 and 2021

were Auctus, Posner and/or Sollami associated with individuals or entities that were registered with the SEC as dealers, nor did the Defendants associate Auctus or the Fund with an SEC-registered dealer. [Id. ¶ 40].

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege sufficient facts to state a claim for relief that is "plausible on its face" and actionable as a matter of law. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Reading the complaint "as a whole," the court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).

First, the court must perform a close reading of the complaint to distinguish factual allegations from conclusory legal statements. Id. Factual allegations must be accepted as true, while legal conclusions are not entitled to credit. Id. A court may not disregard properly pleaded factual allegations even if actual proof of those facts is improbable. Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).

Second, the court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011) (quoting Iqbal, 556 U.S. at 678).

Dismissal is appropriate when the complaint fails to "allege a plausible entitlement to relief." Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Twombly, 550 U.S. 544 at 559).

**III.    DISCUSSION**

The Securities Exchange Act of 1934 ("Exchange Act") defines a dealer as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A). Under what is known as the "trader exception," that definition excludes any person who buys or sells securities "not as a part of a regular business." 15 U.S.C. § 78c(a)(5)(B); Auctus Fund, LLC v. OriginClear, Inc., 2023 WL 2140478, at *7 (D. Mass. Feb. 21, 2023).

The Exchange Act requires dealers to be registered with the Commission. 15 U.S.C. § 78o(b). Section 15(a) states:

> It shall be unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section.

15 U.S.C. § 78o(a)(1). The broker-dealer registration requirement "ensures that sellers of securities understand and appreciate both the nature of the securities they sell and their responsibilities to the investors." EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC, 6 F.4th 50, 58 (1st Cir. 2021) (quoting Roth v. S.E.C., 22 F.3d 1108, 1109 (D.C. Cir. 1994)) (internal alterations omitted).

The question here is whether Defendants are "dealers" subject to the registration requirement. Defendants contend that there is a bright-line distinction between those that buy and sell to effectuate customer orders (broker-dealers) and those that trade on behalf of investors, like Defendants (non-broker-dealers). [Dkt. 26 at 9]. They maintain that the legislative history and intent underlying the Exchange Act support this interpretation. [Id. at 13-14]. The SEC responds that the only distinction between a dealer and a non-dealer contained in the text of the Exchange Act is that a dealer trades as part of a regular business. [Dkt. 38 at 11].

5

The Supreme Court has repeatedly emphasized the importance of the plain meaning rule, stating that if the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written. Textron Inc. v. Comm'r, 336 F.3d 26, 31 (1st Cir. 2003) (collecting cases). Therefore, when considering the question of what constitutes a "dealer," one must begin by examining the language of the Exchange Act.

A. **Textual Analysis**

Defendants assert that they are not dealers because dealers, like brokers, effectuate customer orders, whereas Defendants buy and sell on behalf of investors. [Dkt. 26 at 1-2]. Defendants point to the parallel language of the Exchange Act which contrasts "broker" ("any person engaged in the business of effecting transactions in securities for the account of others") with "dealers" ("any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise"). [Id. at 8]; 15 U.S.C. § 78c(a)(4)(A), (5)(a) (emphasis added). The assumption underlying the structure of the text, Defendants submit, is that in all other ways brokers and dealers are the same; i.e., they both buy and sell securities to effectuate customer orders. [See Dkt. 26 at 8].

The SEC responds that nowhere does the Exchange Act distinguish between customer-facing roles and non-customer-facing roles. However, it does distinguish between those who are "in the business of buying and selling securities" and those who buy or sell securities "not as a part of a regular business." [See Dkt. 38 at 11]; 15 U.S.C. § 78c(a)(5)(A)-(B).

Many courts have recently considered the definition of "dealer" in the context of the Exchange Act's registration requirement. While there is no binding precedent from the First Circuit, multiple district courts and the Eleventh Circuit have held that, at least at the pleading stage, the "dealer" designation turns on whether the person or entity is "in the business of buying

or selling securities."[1]

"The 'centerpiece' of the Exchange Act's dealer definition is the word 'business,' which is 'a particular occupation or employment habitually engaged in for livelihood or gain.'" SEC v. Almagarby, 92 F.4th 1306, 1317 (11th Cir. 2024) (quoting SEC v. Big Apple Consulting USA, Inc., 783 F.3d 786, 809 (11th Cir. 2015) (quoting Black's Law Dictionary 239 (10th ed. 2009))). "Cases and S.E.C. No-Action letters interpreting the phrase have indicated that regularity of participation is the primary indicia of being 'engaged in the business.'" SEC v. Kenton Cap., Ltd., 69 F. Supp. 2d 1, 12 (D.D.C. 1998) (collecting cases).

In reviewing SEC enforcement actions involving the purchase of convertible securities, courts have examined the "nature, volume, regularity, and frequency" of the transactions to determine whether the party is a "dealer." SEC v. Keener, 102 F.4th 1328, 1334 (11th Cir. 2024) (finding that defendant was a "dealer" where his "profits were made from converting microcap debt into stock at a discount and selling the resultant shares in high volumes," "his business operations were . . . extensive," and he "maintained a public website . . . issued press releases to solicit borrowers; and sponsored and attended lavish industry conferences for microcap issuers."); Almagarby, 92 F.4th at 1316-17 (finding that defendant was a "dealer" because he "acquired stock for the purpose of immediate resale," he "engaged in high-volume resales of microcap shares," he "behaved like an underwriter" by bringing new shares to market, and he used third parties to "solicit[] market participants on his behalf to find securities available for his

---

[1] In their "Notice of Supplemental Authorities" [Dkt. 62], Defendants urge the Court to apply the Fifth Circuit's reasoning in Nat'l Ass'n of Priv. Fund Managers v. SEC, 103 F.4th 1097 (5th Cir. 2024), which rejected the SEC's interpretation of Section 211(h) of the Investment Advisers Act of 1940, finding that the term "investors" does not include private fund advisors.  There, the court noted that it was "most telling [that] section 913 of the Dodd-Frank Act—the section the Commission relies on—applies to 'retail customers,' not private fund investors.  It has nothing to do with private funds." Id. at 1112.  The court described the history of the Advisor's Act and the numerous ways that Congress explicitly exempted private funds from its regulations. Id. at 1111.  That is clearly distinguishable from the Exchange Act, which does not ever differentiate between customer-facing roles and non-customer-facing roles.

purchase"); Big Apple Consulting USA, 783 F.3d at 809-10 (finding that defendant was a dealer because his "entire business model was predicated on the purchase and sale of securities" and he "purchased . . . stocks at deep discounts pursuant to its contractual agreement . . . and then sold those stocks for profit").

In Almagarby, the Eleventh Circuit examined the case of a defendant whose business model was similar to that of Defendants: he bought convertible notes, converted them to stock at a discount, and quickly sold the stock at a profit. 92 F.4th at 1316. In holding that the defendant was a "dealer" subject to the Act's registration requirement, the Eleventh Circuit found the "trader exception" illustrative. See id. at 1315-16 (agreeing with Commission that defendant's volume and regularity of transactions, coupled with his businesses' major focus on flipping penny stocks, precludes him from the "trader exemption"). The court explained that a dealer typically "profits from trade execution . . . . In other words, a dealer's business model depends on his volume of buying and selling because he profits from executing trades." Id. at 1315. By contrast, a trader "profits from the 'appreciation in the value' of his investment portfolio instead of from trade execution. Because a trader can make lucrative profits from a few good investments, his business does not necessarily depend on high transaction volumes." Id. (quoting In re Sodorff, 50 S.E.C. 1249, 1992 WL 224082, at *5 & n. 27 (Sept. 2, 1992)). Because the defendant bought convertible notes for the purpose of quickly converting the debt and reselling it at a profit, the court held that he was acting as a dealer. See id. at 1316 (agreeing with the Commission's argument that buying convertible debt for the purpose of immediate conversion are activities of dealers). As further evidence of the defendant's "dealer" behavior, the Eleventh Circuit noted that the defendant brought new shares to market, thereby acting as an underwriter, and performed these transactions at such a volume and with such regularity as to render him "in

8

the business of buying and selling securities." Id. at 1316-17 (collecting cases); U.S.C. § 78c(a)(5)(A).

Here, the SEC submits that Defendants meet the criteria of a dealer because, as alleged in the complaint, Defendants (1) brought to the market billions of new shares of stock over the course of many years, involving over 100 public companies [Dkt. 1 ¶¶ 4, 38], (2) identified and solicited customers for their convertible note business [id. ¶ 33], and (3) generated over $100 million in profit from converting debt to stock for resale in the market [id. ¶ 16]. These allegations are sufficient to state a claim that Defendants were "dealers" subject to the Exchange Act's registration requirement.

### B.  Legislative History

Even if the language of the Exchange Act were ambiguous, a review of the legislative history and intent underlying the Exchange Act would prompt the same conclusion.

Citing contemporaneous reports from the 1930s, Defendants contend that when Congress passed the Exchange Act, it intended the only distinction between "broker" and "dealer" to be that the "broker" acted as a customer's representative when buying or selling securities, whereas a "dealer" effectuated a customer's order by selling or buying from the customer directly. [Dkt. 26 at 9-10]. Among Defendants' sources is Meyer's Law of Stockbrokers and Stock Exchanges, which references how a dealer interacts with his customers. [Id. at 10]; Charles H. Meyer, The Law of Stockbrokers and Stock Exchanges § 43-a, 32-34 (1933 cum. supp.).

However, Meyer published another treatise the following year in which he contemplates the question of whether "a trader who has no customers but merely trades for his own account through a broker is a 'dealer' under the Act." Charles H. Meyer, The Securities Exchange Act of 1934 Analyzed and Explained § 3, 34 (1934). Meyer concludes that "[a] fair interpretation of the

Act would seem to indicate that if the operations of a trader are sufficiently extensive to be regarded as a regular business, he would be considered a 'dealer.'" Id. This language clearly shows that, in 1934, there was no established understanding that dealers only worked for customers.

The Eleventh Circuit agrees. "'[A] customer requirement has no grounding in the statutory text' of the Exchange Act." Keener, 102 F.4th at 1334 (quoting Almagarby, 92 F.4th at 1318). The court also noted that several provisions of the Exchange Act reference a dealer that is not customer-facing. Id. Specifically, 17 C.F.R. § 240.15c3–1(a)(2)(vi) applies to "[a] broker or dealer that does not receive . . . or hold funds or securities for, or owe funds or securities to, customers and does not carry accounts of, or for, customers" and § 240.15c3–1(a)(6)(ii) stipulates that paragraph (a)(6) of that section "shall be available to a dealer . . . who does not carry customer accounts."

Accordingly, Defendants' Motion to Dismiss on the grounds that Defendants are not dealers under the Exchange Act is **DENIED**.

### C. Due Process

Defendants attempt to cast the recent decisions favoring a business-based definition of "dealer" as revolutionary and thus in violation of their right to due process under the Fifth Amendment.

Due process requires "fair notice of what was forbidden." FCC v. Fox Television Stations, Inc., 567 U.S. 239, 254 (2012). An enforcement action may violate due process if the defendant does "not have fair notice of the agency's interpretation" of a law or statute, even if that interpretation is reasonable. Gen. Elec. Co. v. EPA, 53 F.3d 1324, 1331 (D.C. Cir. 1995). The fair notice principle applies to administrative actions, see Vill. of Hoffman Ests. v. Flipside,

10

Hoffman Ests., Inc., 455 U.S. 489, 498–99 (1982), but it has been recognized in only a "very limited" set of cases, Suburban Air Freight, Inc. v. Transp. Sec. Admin., 716 F.3d 679, 684 (D.C. Cir. 2013).

Defendants cite Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 157-58 (2012) for the proposition that it is "unfair surprise" to "require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference." Id. at 158-59. However, Christopher is distinguishable.

First, the primary question in Christopher was whether the agency's new interpretation of its regulation was entitled to deference under Auer v. Robbins, 519 U.S. 452 (1997), not whether enforcement was a violation of due process. 567 U.S. at 153. The Court determined that the agency's new interpretation was not owed deference because doing so "would seriously undermine the principle that agencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'" Christopher, 567 U.S. at 156 (quoting Gates & Fox Co. v. Occupational Safety and Health Review Comm'n, 790 F.2d 154, 156 (D.C. Cir. 1986)). The Court then proceeded to employ traditional tools of interpretation to determine whether the regulation applied to the relevant parties. Id. at 161. The same has been done here, supra.

Second, the Court in Christopher found it "important" that the agency "never initiated any enforcement actions . . . or otherwise suggested that it thought the industry was acting unlawfully." 567 U.S. at 157.[2] Defendants cite SEC v. Ridenour, 913 F.2d 515, 517 (8th Cir.

---

[2] Defendants cite a variety of documents—including an SEC No-Action Letter, filings from other cases, and an article from *Forbes*—to support its contention that the SEC was aware and approved of Defendants' practices. First, it is not inconsistent to imagine that market transactions, which at one time did not qualify as dealer behavior, grew in volume, profit, and proliferation such that they later qualified as such. Second, in ruling on a motion to dismiss

11

1990) and Eastside Church of Christ v. Nat'l Plan, Inc., 391 F.2d 357, 361 (5th Cir. 1968) in support of their contention that the SEC has never enforced this novel interpretation of the Exchange Act. [Dkt. 26 at 17]. However, in representing that these cases were decided "in the context of customer-order facilitation," Defendants elide over the actual reasoning underlying the decisions. [Id.]. In Ridenour, the Eighth Circuit held that:

> It is undisputed that, during the period from 1979 to 1981, Ridenour engaged in a series of transactions involving municipal and corporate securities. We agree with the government that Ridenour's <u>level of activity during this period made him more than an active investor</u> . . . . We find no error in the court's conclusion that Ridenour was a broker-dealer, and that his failure to register as such violated section 15(a)(1) of the Securities Exchange Act, 15 U.S.C. § 78o (a)(1).

913 F.2d at 517 (emphasis added).

In Eastside Church, the Fifth Circuit held that "[t]he evidence demands a finding that National was so engaged [as a dealer]. National purchased many church bonds prior to the ones in question for its own account <u>as a part of its regular business</u> and sold some of them." Eastside Church, 391 F.2d at 361 (emphasis added). Furthermore, the Eleventh Circuit recently cited Eastside Church as support for the business-based interpretation of "dealer." Keener, 102 F.4th at 1333.

As these cases demonstrate, while it may be more common for a dealer to be customer-facing, the courts have employed a business-based analysis when assessing whether a party is a "dealer" subject to the Exchange Act's registration requirement.

---

for failure to state a claim, "a court ordinarily may only consider facts alleged in the complaint and exhibits attached thereto, or else convert the motion into one for summary judgment." Freeman v. Town of Hudson, 714 F.3d 29, 35-36 (1st Cir. 2013) (citation omitted). "Under certain narrow exceptions—including for 'documents the authenticity of which are not disputed by the parties' and 'official public records'—'some extrinsic documents may be considered without converting a motion to dismiss into a motion for summary judgment.'" Douglas v. Hirshon, 63 F.4th 49, 57 (1st Cir. 2023) (quoting Freeman, 714 F.3d at 36) (internal quotations omitted). "[A] district court may, but is not required to incorporate documents by reference." Id. (quoting Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1159 (9th Cir. 2012)). Here, should Defendants wish to argue that the SEC specifically misled them, they may present evidence to support that claim after the close of discovery.

Accordingly, Defendants' motion to dismiss on due process grounds is **DENIED**.

**D.      Disgorgement**

The Exchange Act provides that "[i]n any action or proceeding brought by the [SEC] under any provision of the securities laws, the [SEC] may seek, and any [f]ederal court may order, disgorgement." 15 U.S.C. § 78u(d)(7). Federal courts have jurisdiction to "require disgorgement" under that provision "of any unjust enrichment by the person who received such unjust enrichment as a result of" a securities law violation. Id. § 78u(d)(3)(A)(ii). Recently, the Supreme Court clarified the purpose of disgorgement, explaining that Section 78u(d)(5) restricts equitable relief to "that which 'may be appropriate or necessary for the benefit of investors.'" Liu v. SEC, 591 U.S. 71, 87 (2020) (quoting 15 U.S.C. § 78u(d)(5)).

Defendants submit that the complaint does not state a viable claim for disgorgement, because (1) there is no causal connection between their profits and any alleged failure to register and (2) there are no victims; therefore, there is no cause for equitable relief. [Dkt. 26 at 27]. The SEC responds that Defendants unlawfully bought and sold securities; thus, any profits generated from those transactions are causally related to the unlawful behavior. [Dkt. 38 at 19-20].

At this early stage, the complaint sufficiently states a claim for disgorgement. As the Eleventh Circuit explained in Almagarby, "[defendant] was altogether prohibited from making transactions as an unregistered dealer, so any profits generated from his prohibited transactions were causally linked to his failure to register." 92 F.4th at 1321; see also Keener, 102 F.4th at 1337. The SEC will have the opportunity to offer evidence of investor harm, which Defendants may rebut, after the close of discovery.

**IV.     CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss [Dkt. 25] is **DENIED**.

**SO ORDERED.**

Dated: July 22, 2024

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge